## WALLING v. NASHVILLE, CHATTANOOGA & ST. LOUIS RY.

### Civ. No. 524.

District Court, M. D. Tennessee, Nashville Division.

June 18, 1945.

George W. Jansen and Paul M. Cadra, both of Washington, D. C., and Jeter S. Ray, of Nashville, Tenn., for plaintiff.

Walton Whitwell and Edwin F. Hunt, both of Nashville, Tenn., for defendant.

STRUM, District Judge.

The question here presented is whether or not persons in training for positions with the defendant railway are, during their training period, "employees" within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. Asserting that they are employees, and that defendant is in violation of the Act with respect to them, plaintiff Administrator seeks injunctive relief to compel future obedience to the Act.

The controversy concerns: First, persons in training for firemen, brakemen and switchmen, both in the yards and on the main line, called "cubs." Second, persons in training for clerks, stenographers, callers, messengers, and the like, called "posters." The Administrator contends, while defendant denies, that during their training period these trainees are "employees" within the meaning of the Act and that they should be compensated, and records kept for them, as required by the Act and regulations thereunder.

It is obvious that an inexperienced person cannot safely perform the intricate and hazardous duties of a railway fireman, brakeman or switchman. Experience and specialized learning are essential, not only to efficiency, but to the public safety and to the safety of the trainmen. Even though a person is generally experienced in rail-

roading, he must still learn the yards, tracks, signals, engines, mechanical devices, and many other things pertaining to the particular railroad on which he is employed, before he can perform his duties with safety to himself and to the public. In these vocations, proficiency depends upon manual as well as theoretical training.

In keeping with the custom of all railroads, this defendant requires applicants for employment as trainmen to undergo a period of preliminary training, called "cubbing," under the tutelage of a regular employee performing the same type of work. This training period covers from one to three weeks, depending upon the student's aptitude, during which time the trainee accompanies a regular crew who show him on the job how to perform the duties of that employment. The student learns not only by observation, but by actually performing the duties of the employment he seeks, always under the immediate supervision of a regular employee. When the student has apparently become proficient he is given an examination touching his qualifications. If he thus demonstrates his proficiency, he is then, but not before, placed upon the "extra board" as an employee, and called into service as needed. It is only from that time that they assume the responsibility of employees and are regarded as employees. Their seniority with other employees dates from that time, not from the time they commenced training. This practice is approved by the Railway Brotherhoods who bargain with the employer on behalf of its employees. Under these contracts one is not deemed an employee until he has finished his training and has been listed on the extra board.

As experience is also necessary in the second classification (clerks, messengers, etc.), though perhaps not to the same extent as in the case of the trainmen, applicants for these positions are required, in the same manner, to undergo a brief period of preliminary training, called "posting," under a regular employee performing that type of work. Although their duties are clerical or non-operational in character, many of them are frequently required to be in and about the yards, where their own personal safety is at stake. Even the purely clerical employee must have the necessary training to fit him to work harmoniously as an integral part of a highly specialized transportation system. The training period for these students is from three to ten days, after which they are put into a regular job when needed. During this training period these students accompany a regular employee, or under the guidance of a regular employee perform the duties of the job for which they are fitting themselves.

When a trainee enters upon his training, he does not regard himself as an employee, nor does the Company so regard him. He is under no obligation to become an employee when he finishes his training, nor is the Company under any obligation to so retain him. Whether or not he remains as an employee is entirely optional with him. During the training period the Company exercises no authority or control over his activities, nor the manner in which they are performed. He is not subject to discipline as an employee. No orders are issued to him, although trainmen trainees are given a suggested schedule to follow, which authorizes them to join a certain crew at a designated time. He is at liberty to do so or not, at his election. If he is absent, such absence does not in the slightest degree affect the movement of trains, or other work, as the trainee does no independent work and assumes no responsibility. There is always a regular employee to perform the duties of the job, who is responsible for the proper performance of the duties being learned by the student, and who receives standard pay therefor under the labor contracts. Students are present on the job solely for their own benefit and advantage, in order to qualify themselves for future employment. They are under no obligation to do any work whatever, nor even to report for duty, and when they do perform work it is not to serve the Company, but to enable them to learn the job. The regular paid employee is always there to do the work, and would do it but for the intervention of the student in his own interest. The Company gains nothing from his presence as a student, other than the remote potential advantage of building up a pool of trained persons who will be available as employees when needed. This advantage is diminished to the vanishing point by the fact that it is wholly optional with the trainee whether or not he enters the Company's employ when called.

■ For the purpose of this Act, whether or not the relationship of employer and employee exists is to be determined upon the principles of contract. Tort cases relating to that relationship are inap-

plicable. In order that wages become due, to which the protection of this Act applies, there must be a contract of employment, either express or implied. It is indispensable to the existence of such a contract that the employee perform some service for the benefit of the employer, or in his interest, of which the payment of wages is the quid pro quo. The performance of such a service is here wholly lacking, as is all other indicia of employment, including the authority to direct and control the activities of the trainee. Thus during their training period these trainees act only for their own benefit and in their own interest. Their activities are wholly voluntary. No measurable benefit flows to the Company, for which the law would imply an obligation to pay. It is in this respect that this case fundamentally differs from Walling v. American Needlecrafts, 6 Cir., 139 F.2d 60, relied upon by plaintiff. There the workers labored and produced for the benefit of the employer in circumstances in which the law will imply an obligation to pay them, even though their work was not performed under the direct supervision of the employer. Here, the trainee works, not for the Company, but for himself and produces nothing of benefit to the Company. The law therefore implies no obligation to pay him.

Save in one particular, the "cub" or trainman students here involved are the exact counterparts of those held to be students, not employees, in Walling v. Jacksonville Terminal Company, 5 Cir., 148 F. 2d 768. In the Jacksonville Terminal case the trainees received no compensation whatever. Since about December 1, 1943, the "cub" trainees here involved have received a flat $5 per day, except for a short period when such payments were made only to those who completed their training. This payment is now made to all "cubs," regardless of whether or not their training is completed. The Company is endeavoring to also pay those from whom such payments were formerly withheld because they did not complete their training, as rapidly as these former uncompensated trainees can be located.

■ The payment of wages is one of the indicia of a contract of employment. This $5 per day paid to "cub" trainees, however, is more a gratuity than compensation, for these trainees render no beneficial service to the Company to earn any "wages". The recipients of these payments are working for themselves, not for the Company. Nor are they under the direction or control of the Company as an employee would be.

These payments were commenced in 1943, not because the Company considered that the trainees performed services of value, but pursuant to the recommendation of a joint committee of railway and labor executives, which committee referred to the payment as "pre-employment" pay, and recommended that the payments be made because many of these trainees were married men with dependents who could not afford to undergo a period of training without some source of income. In making the payments the Company regards them as incentive pay, not wages.

■ The Court therefore holds that these trainees are not employees within the meaning of the Act, for the reasons so well stated by Judge Sibley in the Jacksonville Terminal Company case, supra. The gratuitous payments made to them by the Company do not constitute them employees, nor does it fundamentally distinguish them from the trainees involved in the Jacksonville case.

But even if they were employees, this payment substantially complies with the requirements of the Act. Most of these "cubs" devote eight hours a day, at most, to their training, so these are paid at the rate of 62½¢ per hour. Some of them, while "cubbing" on local main line trains, are in training twelve hours per day, which produces a compensation of a little more than 40¢ per hour. It is only in the relatively small number of cases where "cubs" are training on local main line trains, with a 12 hour schedule and which are late in reaching their ultimate destination, that they are training more than 12 hours per day so that the sum actually received by them in such instances falls slightly below the 40¢ per hour minimum required by the Act. These instances are relatively few. So in a broad and substantial sense, and subject to occasional exceptions, these "cubs" actually received compensation in accordance with the Act.

■ As to the "poster" (office) trainees: For the same general reasons above stated, the Court holds that these are not "employees" within the meaning of the Act. But even if they are, the Company is now and for several years past has been complying with the Act as to them, and ap-

parently intends in good faith to do so in the future.

Originally, these trainees were not compensated during their training period. Beginning about 1941, however, the management of the Company, although not conceding then or now that they are "employees," issued instructions to pay them a sum equal to the minimum requirement of the Act, and to keep the records on them required by the Act. These instructions were generally carried out over the defendant's system, and still are. Due, however, to a misunderstanding of these instructions at the Craven Yards at Chattanooga, these "poster" trainees were not paid for a substantial period of time after the custom of paying such trainees was instituted. When this omission was discovered, it was immediately corrected by issuing pay vouchers covering this period, many of which have been delivered to the payees, and the remainder are being delivered as rapidly as the former trainees can be located for that purpose. All such trainees have been paid in accordance with the Act, and proper records kept for six months or more last past. So even if they are "employees," which the Court holds that they are not, there is no necessity for an injunction, the purpose of an injunction being to prevent future violations, not to punish past violations.

Nor are these trainees "learners" as contemplated by the Act. A "learner" is an employee who labors in the interest and for the benefit of his employer, and who produces something, or performs a service in the employer's interest, but due to inexperience or some other handicap the product of his labor is inferior to that of an experienced worker. The point of cleavage is that the "learner," though his product be inferior or limited, is nevertheless working for the benefit of his employer and contributing to the employer's interest as far as the learner's capabilities permit, while the trainees here involved are working solely for themselves. The Company gains no measurable benefit from their activities.

The Court holds that none of these trainees are "employees" within the meaning of the Act. But even if they are employees, the payments voluntarily made to them, and the records now kept, are sufficient to satisfy the requirements of the Act.

Judgment for defendant.