WALLING v. JACKSONVILLE
TERMINAL CO.
No. 11198.

Circuit Court of Appeals, Fifth Circuit.
April 23, 1945.

Douglas B. Maggs, Solicitor, U. S. Department of Labor, Bessie Margolin, Asst. Solicitor, U. S. Dept. of Labor, and George M. Szabad, Attorney, in Chief Appellate Section, Office of Solicitor, U. S. Dept. of Labor, all of Washington, D. C., and Geo. A. Downing, Regional Attorney, Dept. of Labor, of Atlanta, Ga., for appellant.

Charles Cook Howell, Elliott Adams, and Harold B. Wahl, all of Jacksonville, Fla., for appellee.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

SIBLEY, Circuit Judge.

Charging that Jacksonville Terminal Company was violating the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., as to a number of its employees, which it claimed to be learners, by failing to pay the minimum wages and to keep the records required by the Act with respect to them, the Administrator sought to enjoin such violation. The Company admitted the al-

legations, except that it denied the learners, which it called "trainees", were its employees. The district court denied the injunction, and the Administrator appeals. The sole question is whether the trainees are employees under the Act.

The facts as found by the district court are not disputed. The Company has at Jacksonville, Florida, a large and complicated network of tracks and interlocking switches by means of which it assembles and prepares for departure all outgoing trains, and disassembles all incoming trains of all the railroads, handling about 100 trains per day, and having more than a thousand employees, in interstate commerce. A full crew serves each engine, consisting of a yard foreman, two switchmen, an engineer and a fireman. To operate with safety and without confusion the switchmen and enginemen must have knowledge not only of general railroad work, but of the yards and switches and signal systems and rules of operation of the Company. Following a general practice of railroads, the Company requires of all applicants for employment in engine or switching service that they undergo a training period, during which no compensation is paid. The trainee is assigned to work with a full crew. He learns first by observation, and then by doing some of the regular work under the supervision of the crew member whose work he is doing. A trainee has no regular time to report or hours for training, though generally he joins a crew at the beginning of their shift and exhibits his permit to receive instruction. He is free to select such time each day as best suits his convenience, and frequently appears after completing his day's work elsewhere. He is required to study the Company's rules and regulations, and become familiar with the terminal, its layout, interlocking and signal devices, location of tracks and other facilities, touching all of which he must stand an examination before he can work as a regular employee. After evidencing his ability practically, as certified by a required number of his instructors, and standing his examination, he may be placed on the pay roll and become entitled to the wages established by collective bargaining. Upon his first day's regular employment he goes on the Company's seniority list. The length of time taken for training varies with the previous experience, the aptitude and the intelligence of the trainee. Some men qualify in a day, some require two weeks, and some never qualify. The average is about a week.

The trainee is under no obligation to become a regular employee, nor is the Company under obligation to give him such employment. The Company has never considered him as an employee till given his first assignment. Under its labor agreements with its employees he does not go on the seniority list till that time. When the trainee applies for a permit to train he executes a written agreement with the Company which states that whereas he desires to enter the service of the Company, and it is necessary to ride the engines and to learn the yards "in order to prepare myself for such service in case the Jacksonville Terminal Company elects at any time in the future to employ me; now therefore I agree, First, that Jacksonville Terminal Company is not liable to me for any compensation while I am so engaged in learning said yards. * * * Second, that I assume all risks of whatsoever nature incident to learning said yards, and agree to hold said Jacksonville Terminal Company harmless for any injury I may receive. * * *"

The district court summarized the situation thus [55 F.Supp. 302, 304): "None of the usual indicia of the employee relationship exist here as to the trainee. He is not subject to the rules of the defendant applicable to employees; no control is exercised over his time; he is not required to report at any specified time; defendant has no right to demand or require work from him; he comes and goes as he pleases; and both he and defendant understand and agree he is not to be paid during the training period." The conclusion of law is thus stated: "It is not the purpose of the Fair Labor Standards Act to create new wage liabilities, but where a wage liability exists, to measure it by the standards fixed by law. If one has not hired another expressly, nor suffered nor permitted him to work under circumstances where an obligation to pay him will be implied, they are not employer and employee under the Act."

We approve the above summarization of the facts. The legal conclusion is quoted from an early decision of this court, Bowman v. Pace, 5 Cir., 119 F.2d 858, from which we see no reason to recede. The Act, Sect. 3(e) (g), defines "employee" as

any individual employed by an employer; and "employ" as including "to suffer or permit to work." The last-quoted words do not mean that every one who permits some one to work for a third person or the worker's own self becomes an employer bound to pay statutory wages. They mean that one is an employer if he permits another to work *for him*, though he has not expressly hired or employed him. The mere fact that he could have prevented the service does not make him in all cases an employer. A purely voluntary service, for which no one intends there shall be pay, is not employment, but a gift. To permit another to work in my shop in making or repairing something for himself, would not make him my employee. The words "suffer or permit·to work" must be understood with common sense. In the present case the Company did suffer the trainee to work on its premises and with its appliances, but the benefit immediately in view was to the trainee, that he might learn, might qualify himself for a job which he desired. While studying the rule book or observing the yards and the crews he was doing nothing to the benefit of the Company. When he was allowed to fire the engine, or throw switches or transmit signals, it was for his instruction. The Company was not bene-.fitted, for it had present a man hired to do it who would have done it but for the presence and interference of the trainee. And the parties had formally agreed that what was done was not for the Company, but for the trainee's benefit and that no pay was, expected. The agreement was made in good faith and represented the truth of the relationship. The trainees are not child-laborers, nor economically oppressed persons, nor in danger of injury by sub-standard living during the short period of training. The regular employees have all been trainees,, and are now members of the powerful unions of railroad men, and some of the trainees with railroad experience no doubt are members too. These unions recognize the trainee's status and their contracts with the Company provide for the acceptance of them as employees. No abuse sought to be remedied by the Fair Labor Standards Act appears. We see no occasion to give an unreasonable interpretation to its words to upset this practice, apparently satisfactory to all concerned.

We might well stop here, but will answer some of the Administrator's counter-arguments. It is said there is an indirect and ultimate benefit to the Company from the training in that it supplies a pool from which to draw competent employees when needed. If such employees should be in demand, so that the Company were seeking trainees instead of trainees seeking permits to train, a different arrangement might result under which training with pay might be agreed on. Apparently that is not now the case; certainly that is not the present basis of the training. Our task is but to ascertain the arrangement the parties have made and apply the law to it.

■ And it is urged that Section 14 of the Act condemns this training plan unless under a special certificate and with wages specially fixed by the Administrator for learners. We do not construe Section 14 as aimed at curtailment of teaching the industrial arts, but rather at helping learners and other handicapped persons who could not command for their services the full wages fixed by the Act, to get them employment at less wages rather than no employment at all. The Section lays a duty on the Administrator to provide for such persons. But its provisions apply only to the "employment" of learners, and the "employment" of handicapped persons. If any person is willing to use such employees in his business, that is, to employ them, he must obtain a certificate and a lower wage fixed by the Administrator in order to escape the demands of the Act. But if he is not *employing* learners, but is in good faith endeavoring merely to *teach* them, the Section does not apply, for no wages at all are due.

■ The correctness of the test of employment stated in Bowman v. Pace, supra, is questioned. That case was cited and followed in the Eighth Circuit in Helena Glendale Ferry Co. v. Walling, 132 F.2d 616, 620. In the Sixth Circuit, in Walling v. Sanders, 136 F.2d 78, it was similarly held that suffering certain drivers to help an employer's travelling salesmen in their work on an arrangement between themselves, did not make the drivers the employees of the main employer. The Supreme Court has made no decision of the point. The case of Williams v. Jacksonville Terminal Co., 315 U.S. 386, 388, 62 S.Ct. 659, 86 L.Ed. 914, did not turn on

the existence of an employer-employee relationship, which was conceded, but on whether tips could be counted as part of the wages due. In Tennessee Co. v. Muscoda Local, 5 Cir., 135 F.2d 320, 5 Cir., 137 F.2d 176, Id., 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949, the relationship was admitted, and the contest was as to what constituted work hours. The decision was finally rested on the particular findings of fact. The case of National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, involved the right of newsboys to become organized for collective bargaining under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and had nothing to do with the Fair Labor Standards Act. Similarly the many cases cited as to the liability in tort for personal injuries suffered by persons in training are far afield. The varying duties and degrees of care to be observed for the safety of persons exposed to danger are not the touchstones for this Act, which relates only to the wages to be paid employees. We repeat what we said in Bowman v. Pace, supra [119 F.2d 861], that "Wages are due according to principles of contract, not of tort."

The judgment is affirmed.