**WALLING v. PORTLAND TERMINAL CO.**
**No. 4111.**

Circuit Court of Appeals, First Circuit.
April 29, 1946.

MAGRUDER, Circuit Judge, dissenting.

Morton Liftin, Atty., William S. Tyson, Acting Sol., and Jeter S. Ray, Asst. Sol., all of Washington, D. C., George H. Foley, Regional Atty:, of Boston, Mass., George W. Jansen, Supervising Atty., of Washington, D. C., and Harry A. Tuell, Senior Atty., of Boston, Mass., for appellant.

E. Spencer Miller, of Portland, Me., for appellee.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

MAHONEY, Circuit Judge.

The district court denied an injunction sought by the Administrator of the Wage and Hour Division of the United States Department of Labor against the defendant for alleged violations of §§ 15(a) (2) and 15(a) (5) of the Fair Labor Standards Act, 29 U.S.C.A. § 215(a) (2, 5), and from that decision the Administrator has appealed. This case calls upon us to determine whether persons who are engaged in training for positions with the defendant company as yard brakemen are "employed" by the company or are "employees" of the company during the training period within the meaning of § 3(e) and (g) of said Act, 29 U.S.C.A. § 203(e, g). If these so-called "trainees" or "learners" are "employees" then the defendant must pay them the minimum wages and keep the records required by §§ 6(a) and 11(c) of the Act, 29 U.S.C.A. §§ 206(a), 211(c).

Because of the disposition we make of the case, it is unnecessary for us to consider whether these trainees are engaged in interstate commerce.

The defendant operates a railroad terminal at Portland, Maine, and employs yard crews in the operation of its facilities. For some years it has been the custom of the defendant and other railroad companies to require all inexperienced applicants for jobs as yard brakemen to go through a training period. Prospective workers are required to file a formal application for employment, to take an eye test and undergo, at their own expense, a physical examination by a physician designated by the company. If the applicant passes these examinations he is assigned to a conductor who is in charge of a yard crew of three regular men and he goes through a training period. The trainees are given an opportunity to observe the type of work they will do when and if they become regular brakemen. Under supervision of regular crew members they are gradually permitted to do more and more of the work which the regulars do until such time as the conductor deems them competent to serve without supervision. If a trainee finishes his training period and is certified by the conductor as competent to carry out the duties of a brakeman, his name is placed "on the board", which means that he is eligible for employment as a regular. Before October 1, 1943, the trainees were not paid during

the training period. Since then the company has paid each trainee $4 a day for each eight hour day of that period if he finishes his training and is placed "on the board".[1] If he does not complete his training period or is not certified as competent, he receives nothing for the time he has put in. The trainees are informed of these provisions in regard to compensation before they are permitted to start their training. The length of the training period required depends upon the aptitude and skill exhibited by the individual trainee and averages about seven or eight days. The maximum length of the period is two weeks. The application for employment which is signed by the prospective trainee states: "It is agreed by me to serve for at least two weeks under instructions of a conductor for the purpose of learning the duties and qualifying for such position, employment to be subject of (sic) passing required examinations on the operating rules, the working rules and regulations as from time to time applied, and the approval of the designated officer." During the period of training, the trainee is expected to be present with the crew to which he has been assigned during the working hours, which are normally eight hours a day, but are sometimes longer. As a matter of practice, the trainee is not required to pass any examination on the rules of the company, though he is required to copy those rules into a note book.

The court below found that the work of the trainee "is of no immediate advantage to the Railroad * * * as the trainee does not displace any member of the regular crew at the time. Rather, it is a disadvantage, because a novice undertakes the work to get experience while a trainman stands by watching him, and the operation is apt to be impeded rather than expedited." It found, however, that the training program enables the railroad to obtain "a pool of qualified workmen to draw upon * * *". It also found that the trainee "is not subject to the rules or discipline applicable to an employee and is not considered such".

The finding of the district court that the defendant does not pay the trainees the minimum wage required by § 6 of the Act aside from the $4 allowance and does not maintain the records required by § 11(c) is not in dispute. Thus the sole question presented to us is whether the trainees here under consideration are "employees" within the meaning of the Act, for if they are, the injunction sought by the Administrator should have been granted.

Section 3(d) of the Act defines the word "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee * * *". Section 3(e) defines an employee as "any individual employed by an employer" and Section 3(g) tells us that " 'Employ' includes to suffer or permit to work." Under these definitions, an employee is any individual whom an employer suffers or permits to work. If these definitions were the sole criteria for determination, then it would seem that these trainees are employees, for they are certainly permitted to work on the premises of the Portland Terminal Company under any common definition of the word work. But did Congress intend to include in the classification of employees all persons whom an employer suffers or permits to work? Did Congress

---

[1] On October 1, 1943, the defendant wrote to the Chairman of Brotherhood of Railroad Trainmen, in conformity with an agreement between it and the Brotherhood. This letter follows:

"Our talk of September 28th—

"Effective October 1, 1943, and for the duration of the present Emergency, Student Brakemen, Road or Yard, will be made an allowance of $4.00 per day, for each calendar day, with a maximum number of ten days irrespective of the hours devoted or the miles made on any day, the Student to devote not less than eight (8) hours each day to the service.

"Payment to be made if and when the Student has qualified, is accepted for and takes employment.

"If this arrangement meets with your approval, will you please so acknowledge on the second copy of this letter, which is attached."

Soon after this agreement, the Company advertised in newspapers for the services of trainees on these terms.

There is no evidence that this practice will be continued beyond the "present Emergency". It does not appear that the defendant is under any contractual obligation to continue it.

intend to compel an employer to pay the minimum wage required by the Act to a person who voluntarily and purely for his own benefit seeks to labor under an employer's control? Suppose an author desired to work in the train yards in preparation for writing a novel and requested the Portland Terminal Company to give him an opportunity to do so. Would the Terminal Company be obligated to pay him the minimum wage, when the author neither sought nor expected pay? It hardly seems that Congress intended the Act to cover such an individual. And yet a literal construction of the definitions in the Act would compel the Company to pay the author the minimum wage, for if he pulled any pins or threw any switches or coupled any cars, he would be working and the company would be permitting him to work.

A number of cases have arisen where an employee (or an independent contractor) hires an individual to work on the premises or with the property of his employer with the knowledge of the latter. At least three Circuit Courts of Appeals have held that the sub-employee was not an employee of the primary employer within the meaning of the Act even though that employer suffered or permitted him to work. Walling v. Sanders, 6 Cir., 1943, 136 F.2d 78; Helena Glendale Ferry Co. v. Walling, 8 Cir., 1942, 132 F.2d 616; Bowman v. Pace Co., 5 Cir., 1941, 119 F.2d 858.

■■ There is no question but what this statute should be liberally construed for it is remedial and humanitarian legislation. Fleming v. Palmer, 1 Cir., 1941, 123 F.2d 749, 762, certiorari denied 316 U.S. 662, 62 S.Ct. 942, 86 L.Ed. 1739. And the definition of employees is certainly a very comprehensive definition. United States v. Rosenwasser, 1945, 323 U.S. 360, 362, 65 S.Ct. 295. But we do not believe that Congress intended to give to the term "employee" the expansive scope that a literal construction of the words "suffer or permit to work" would compel. We cannot infer that Congress intended the absurdities that such a construction would breed.

■ In deciding that the trainees were not "employees" the district court followed the conclusion and reasoning of Walling v.

Jacksonville Terminal Co., 5 Cir., 1945, 148 F.2d 768, 769, which we have found to be the only appellate court decision similar in factual situation to the case at bar. That case involved trainees for engine and switching service with the Jacksonville Terminal Company. The nature of the training program of that company was similar to the program of the Portland Terminal Company. However, as stated in that case, "A trainee (for the Jacksonville Co.) has no regular time to report or hours for training, though generally he joins a crew at the beginning of their shift and exhibits his permit to receive instruction. He is free to select such time each day as best suits his convenience, and frequently appears after completing his day's work elsewhere." The trainee for the Jacksonville Company was required to study rules and regulations and pass an examination thereon before he could be put on as a regular employee. And the trainee for that company was not entitled to any compensation even though he successfully completed his training and was assigned to a regular job. The court there found that "the Company did suffer the trainee to work on its premises and with its appliances" but because "the benefit immediately in view was to the trainee, that he might learn, might qualify himself for a job which he desired", it held that he was not employed by the Terminal Company within the meaning of the Act. The fundamental reasoning of the court stemmed from its decision in Bowman v. Pace, supra [119 F.2d 860], where it said: "It is not the purpose of the Fair Labor Standards Act to create new wage liabilities, but where a wage liability exists, to measure it by the standards fixed by law. If one has not hired another expressly, nor suffered or permitted him to work under circumstances where an obligation to pay him will be implied, they are not employer and employee under the Act." We do not mean to indorse this test as the sole criterion for determining whether the relationship of employment exists. But we do feel that it is at least one very important element to be taken into consideration.

The fact that the defendant in the instant case made a contingent promise to pay the trainees $4 a day and advertised

in newspapers perhaps makes this case a stronger one for the government. In the Jacksonville Terminal case the court commented that "If such employees should be in demand, so that the Company were seeking trainees instead of trainees seeking permits to train, a different arrangement might result under which training with pay might be agreed on. Apparently that is not now the case; certainly that is not the present basis of the training." We do not believe that the possibility of payment for the work which exists in the case before us is determinative. The promise was contingent. There was no absolute assurance that the trainee would receive payment for his work nor was he absolutely entitled to wages. All that is indicated by the promise to pay and the advertisement requesting trainees is that the company had a more immediate need for trainees, than previously in order to maintain a pool of qualified workers. They do not indicate that the services of the trainee were primarily or necessarily beneficial to the company. Hence we feel that the principles set forth in the Jacksonville Terminal Co. case are applicable here. Even an absolute promise to pay the trainees a specific sum per day regardless of whether they completed the training period and were found competent was not considered sufficient to make the trainees "employees". Walling v. Nashville, Chattanooga & St. Louis Ry., D.C.M.D.Tenn. 1945, 60 F.Supp. 1004.

In Jewell Ridge Coal Corp. v. Local No. 6167, 1945, 325 U.S. 161, 163–166, 65 S.Ct. 1063 and Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, 1944, 321 U.S. 590, 598, 64 S.Ct. 698, 88 L.Ed. 949, the Supreme Court set forth the essential elements of work as (1) physical or mental exertion (whether burdensome or not); (2) con- trolled or required by the employer; and (3) pursued necessarily and primarily for the benefit of the employer and his business. In those cases, the court held that miners while traveling from the mine portals to their station of work in the mines and back were working within the meaning of the Act so as to be entitled to the minimum wages for the time spent in so traveling.

At least one of the three requirements set forth by the Supreme Court is not satisfied in the instant case. Of course, the trainees underwent physical and mental exertion and it may be that this exertion was "controlled or required" by the defendant, but we do not believe that it was "pursued necessarily and primarily for the benefit" of the defendant. In the case of many trainees, the company received no benefit whatsoever for they terminated their relationship before completing the training period. As to those employees the training period was certainly a burden to the company. The company has no guarantee that a trainee will complete his training and ultimately accept employment if it is offered to him. There can be no question, however, but what the company did receive some benefit from the existence of its training program. Without such a program, it would not be long before the company would find itself lacking capable operatives. But the test set forth is not one of benefit to the company. The test is whether the work necessarily or primarily benefits the company. We cannot conclude that the company and not the trainee received the principal benefit of the training program or that the work of a trainee would inevitably benefit the company.

The Administrator urges that § 14 of the Act, 29 U.S.C.A. § 214,[2] assumes that learners are "employees". That section

[2] Sec. 14. "The Administrator, to the extent necessary in order to prevent curtailment of opportunities for employment, shall by regulations or by orders provide for (1) the employment of learners, of apprentices, and of messengers employed exclusively in delivering letters and messages, under special certificates issued pursuant to regulations of the Administrator, at such wages lower than the minimum wage applicable under section 6 and sub- ject to such limitations as to time, number, proportion, and length of service as the Administrator shall prescribe, and (2) the employment of individuals whose earning capacity is impaired by age or physical or mental deficiency or injury, under special certificates issued by the Administrator, at such wages lower than the minimum wage applicable under section 6 and for such period as shall be fixed in such certificates."

gave the administrator discretionary power to "provide for (1) the *employment* of learners * * *" at wages lower than the minimum wage provided for in Section 6. (Italics supplied.) The very wording of Section 14, however, presupposes employment. If a learner is not "employed" within the meaning of the Act, then the Administrator has no authority to make regulations in regard to him. And we have already concluded that these learners are not employed. This interpretation of Section 14 is the same as that rendered in the Jacksonville Terminal Co. case and The Nashville, Chattanooga & St. Louis Ry. case.

The judgment of the District Court is affirmed.

MAGRUDER, Circuit Judge (dissenting).

These "trainees" are required to report for duty at specified hours, and remain on the job during the entire working shift of the regular crew, subject to all the hazards of the employment. They are engaged in mental and physical exertion under the direction and control of a supervisory employee and are gradually broken in to the actual performance of the various routine tasks of yard brakemen. It does not seem to me to be important that the trainees are ordinarily extra men on crews. See Brown v. Chicago, R. I. & P. R. Co., 1926, 315 Mo. 409, 286 S.W. 45, where a "student fireman" serving on a locomotive along with a full engine crew was held to be an employee within the meaning of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. See also Rief v. Great Northern Ry. Co., 1914, 126 Minn. 430, 148 N.W. 309. In view of the recognition in the opinion of the court that the trainees here involved "are certainly permitted to work on the premises of the Portland Terminal Company under any common definition of the word work", I think we are obliged by the comprehensive statutory definitions to hold the trainees to be employees within the meaning of the Fair Labor Standards Act. Cf. Tennessee Coal, Iron & R. Co. v. Muscoda Local, 1944, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949; National Labor Relations Board v. Hearst, 1944, 322 U.S. 111,

64 S.Ct. 851, 88 L.Ed. 1170. Walling v. Sanders, 6 Cir., 1943, 136 F.2d 78, and similar cases, are not controlling, for there the men involved were admittedly employees, and the only question was, who was their employer? Here, if the trainees are employees, Portland Terminal Company is without doubt their employer. If the Terminal Company had followed the practice of putting approved applicants on the payroll immediately as yard brakemen, but had assigned them for the first week or two as extra men accompanying the regular crews to familiarize themselves with the layout of the yard and gradually to undertake performance of the routine tasks under supervision, such new men, I suppose without any question, would be deemed to be employees. Calling them "trainees", instead of yard brakemen on trial or probationary employment, could hardly work a change in their status.

It is of no consequence that during their early training period the trainees may be of little immediate benefit—indeed, may be a "disadvantage"—to the company. This may often be the case with learners or beginners. For instance, inexperienced operators of looms in a textile mill may spoil goods, get the machines out of order, have a low production rate, may be in fact an economic liability to the employer, until skill and facility are acquired. None the less, for better or for worse, they are employees. This was well known to Congress when it enacted the Fair Labor Standards Act. It recognized that in certain employments it might be appropriate to allow the hiring of learners, or "trainees", at less than the generally applicable minimum wage rates. But instead of granting to the employer an outright exemption from the wage provisions of the Act during a specified training period (as was proposed, 83 Cong. Rec. 7389, 7391, 7393), Congress required the payment of the statutory minimum wage to all employees, including learners, unless and until the employer, under regulations to be prescribed by the Wage and Hour Administrator, should obtain a special certificate authorizing the employment of learners at stated wage rates less than the statutory minimum and under such other conditions as the Administrator might pre-

scribe. I think the court's decision in the case at bar constitutes a serious impairment of the administrative safeguards contained in Section 14 of the Act.