## WALLING, WAGE AND HOUR ADMINISTRATOR, *v.* PORTLAND TERMINAL CO.

No. 336.   Argued January 17, 1947.—Decided February 17, 1947.

*William S. Tyson* argued the cause for petitioner. With him on the brief were *Acting Solicitor General Washington, Stanley M. Silverberg* and *Morton Liftin.*

*E. Spencer Miller* argued the cause and filed a brief for respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

This is an action brought by petitioner against respondent in a Federal District Court to enjoin an alleged violation of §§ 15 (a) (2) and 15 (a) (5) of the Fair Labor Standards Act, 52 Stat. 1060, 1068, 29 U. S. C. §§ 215 (a) (2), (5) which requires as to the employees covered by the Act the maintenance of records concerning their wages and the payment to them of minimum wages. The District Court denied the injunction on the ground that the particular persons involved were not employees, 61 F. Supp. 345, and the Circuit Court of Appeals affirmed on the same ground, one judge dissenting. 155 F. 2d 215. See also *Walling* v. *Jacksonville Terminal Co.,* 148 F. 2d 768. Certiorari was granted because of the importance of the questions involved to the administration of the Act. 329 U. S. 696. The findings of fact by the District Court, approved by the Circuit Court of Appeals, and not challenged here, show:

For many years the respondent railroad has given a course of practical training to prospective yard brakemen. This training is a necessary requisite to entrusting them with the important work brakemen must do. An applicant for such jobs is never accepted until he has had this preliminary training, the average length of which is seven or eight days. If accepted for the training course, an applicant is turned over to a yard crew for instruction. Under this supervision, he first learns the routine activities by observation, and is then gradually permitted to do actual work under close scrutiny. His activities do

not displace any of the regular employees, who do most of the work themselves and must stand immediately by to supervise whatever the trainees do. The applicant's work does not expedite the company business, but may, and sometimes does, actually impede and retard it. If these trainees complete their course of instruction satisfactorily and are certified as competent, their names are included in a list from which the company can draw when their services are needed. Unless they complete the training and are certified as competent, they are not placed on the list. Those who are certified and not immediately put to work constitute a pool of qualified workmen available to the railroad when needed. Trainees received no pay or allowance of any kind prior to October 1, 1943. At that time, however, the respondent and the collective bargaining agent, the Brotherhood of Railroad Trainmen, agreed that, for the war period, men who proved their competency and were thereafter listed as accepted and available for work as brakemen should be given a retroactive allowance of $4 per day for their training period. The findings do not indicate that the railroad ever undertook to pay, or the trainees ever expected to receive, any remuneration for the training period other than the contingent allowance.

The Fair Labor Standards Act fixes the minimum wage that employers must pay all employees who work in activities covered by the Act. There is no question but that these trainees do work in the kind of activities covered by the Act. Consequently, if they are employees within the Act's meaning, their employment is governed by the minimum wage provisions. But in determining who are "employees" under the Act, common law employee categories or employer-employee classifications under other statutes are not of controlling significance. See *N. L. R. B.* v. *Hearst Publications*, 322 U. S. 111, 128–129. This Act contains its own definitions, comprehensive enough to require its application to many persons and working rela-

tionships which, prior to this Act, were not deemed to fall within an employer-employee category. See *United States* v. *Rosenwasser*, 323 U. S. 360, 362–363.

Without doubt the Act covers trainees, beginners, apprentices, or learners if they are employed to work for an employer for compensation. This is shown by § 14 of the Act which empowers the Administrator to grant special certificates for the employment of learners, apprentices and handicapped persons at less than the general minimum wage.* The language of this section and its legislative history reveal its purpose. Many persons suffer from such physical handicaps, and many others have so little experience in particular vocations that they are unable to get and hold jobs at standard wages. Consequently, to impose a minimum wage as to them might deprive them of all opportunity to secure work, thereby defeating one of the Act's purposes, which was to increase opportunities for gainful employment. On the other hand, to have written a blanket exemption of all of them from the Act's provisions might have left open a way for wholesale evasions. Flexibility of wage rates for them was therefore provided under the safeguard of administrative permits. This section plainly means that employers who hire beginners, learners, or handicapped persons,

---

*"The Administrator, to the extent necessary in order to prevent curtailment of opportunities for employment, shall by regulations or by orders provide for (1) the employment of learners, of apprentices, and of messengers employed exclusively in delivering letters and messages, under special certificates issued pursuant to regulations of the Administrator, at such wages lower than the minimum wage applicable under section 6 and subject to such limitations as to time, number, proportion, and length of service as the Administrator shall prescribe, . . . ." § 14 (1) Fair Labor Standards Act, 52 Stat. 1060, 1068, 29 U. S. C. § 214 (1). See also § 13 (a) (7). § 14 (2) provides that handicapped persons may be employed at less than minimum wages where the Administrator permits. 52 Stat. 1060, 1068, 29 U. S. C. § 214 (2).

and expressly or impliedly agree to pay them compensation, must pay them the prescribed minimum wage, unless a permit not to pay such minimum has been obtained from the Administrator.   On the other hand, the section carries no implication that all instructors must either get a permit or pay minimum wages to *all* learners; the section only relates to learners who are in "employment."   And the meaning of that term is found in other sections of the Act.

Section 3 (g) of the Act defines "employ" as including "to suffer or permit to work" and § 3 (e) defines "employee" as "any individual employed by an employer." The definition "suffer or permit to work" was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another. Otherwise, all students would be employees of the school or college they attended, and as such entitled to receive minimum wages.   So also, such a construction would sweep under the Act each person who, without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit.   But there is no indication from the legislation now before us that Congress intended to outlaw such relationships as these. The Act's purpose as to wages was to insure that every person whose employment contemplated compensation should not be compelled to sell his services for less than the prescribed minimum wage.   The definitions of "employ" and of "employee" are broad enough to accomplish this.   But, broad as they are, they cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction.   Had these trainees taken courses in railroading in a public or private vocational school, wholly

disassociated from the railroad, it could not reasonably be suggested that they were employees of the school within the meaning of the Act. Nor could they, in that situation, have been considered as employees of the railroad merely because the school's graduates would constitute a labor pool from which the railroad could later draw its employees. The Fair Labor Standards Act was not intended to penalize railroads for providing, free of charge, the same kind of instruction at a place and in a manner which would most greatly benefit the trainees.

Accepting the unchallenged findings here that the railroads receive no "immediate advantage" from any work done by the trainees, we hold that they are not employees within the Act's meaning. We have not ignored the argument that such a holding may open up a way for evasion of the law. But there are neither findings nor charges here that these arrangements were either conceived or carried out in such a way as to violate either the letter or the spirit of the minimum wage law. We therefore have no case before us in which an employer has evasively accepted the services of beginners at pay less that the legal minimum without having obtained permits from the Administrator. It will be time enough to pass upon such evasions when it is contended that they have occurred.

*Affirmed.*

Mr. Justice Frankfurter, concurring.

In this case, as well as in the companion case, No. 335, *post,* p. 158, we have a judgment of two courts based on findings with ample evidence to warrant such findings. It was solely on this ground that I agreed to affirmance in *Tennessee Coal Co.* v. *Muscoda Local,* 321 U. S. 590, and on this basis alone I think the judgments in both these cases, Nos. 335 and 336, should be affirmed.

Mr. Justice Jackson, concurring.

I, too, would affirm this judgment. But my reason is not that stated in the Court's opinion.

I have never understood that the Fair Labor Standards Act was intended or fitted to regulate labor relations, except to substitute its own minimum wage rate for any that was substandard and an overtime rate for hours above the number it set. It, of course, like other statutes, can and should be applied to strike down sham and artifice invented to evade its commands.

But the complex labor relations of this country, which vary from locality to locality, from industry to industry, and perhaps even from unit to unit of the same industry, were left to be regulated by collective bargaining under the National Labor Relations Act. It would be easy to demonstrate from the Act's legislative history that such was the intention of Congress and that it had good grounds to believe this the tenor of the legislation. Organized employees on one side, free of employer domination or coercion, and employers on the other side best know the needs and customs of their trades; they know something of the strain their industry can stand; and after all, it is they who feel the effects. Given thus the machinery to change customs that had outlived their time or, in the alternative, to adjust wage rates to take account of those customs, it was, I think, our duty to pay at least some deference to the customs and contracts of an industry and not to apply the Fair Labor Standards Act to put industry and labor in a legal strait jacket of our own design.

From the beginning it was apparent that there were but two ways of giving real force and meaning to this Act without throwing all industry and labor into strife and litigation. One was to give decisiveness and integrity in borderline cases to collective bargaining. *Cf. J. I. Case Co.* v. *N. L. R. B.*, 321 U. S. 332; *Order of Railroad Telegraphers* v. *Railway Express Agency, Inc.*, 321 U. S. 342.

The other was to give strength and, where possible, decisiveness in doubtful cases to the studied rulings of the Administrator, as the Court also at moments seemed inclined to do. *Armour & Co.* v. *Wantock*, 323 U. S. 126; *Skidmore* v. *Swift & Co.*, 323 U. S. 134. Both of these considerations as bases for decision were thrown to the four winds in *Jewell Ridge Corp.* v. *United Mine Workers*, 325 U. S. 161.

This Court has foreclosed every means by which any claim, however dubious, under this statute or under the Court's elastic and somewhat unpredictable interpretations of it, can safely or finally be settled, except by litigation to final judgment. We have held the individual employee incompetent to compromise or release any part of whatever claim he may have. *Brooklyn Savings Bank* v. *O'Neil*, 324 U. S. 697; *cf. D. A. Schulte, Inc.* v. *Gangi*, 328 U. S. 108. Then we refused to follow the terms of agreements collectively bargained. *Jewell Ridge Corp.* v. *United Mine Workers*, 325 U. S. 161. No kind of agreement between the parties in interest settling borderline cases in a way satisfactory to themselves, however fairly arrived at, is today worth the paper it is written on. Interminable litigation, stimulated by a contingent reward to attorneys, is necessitated by the present state of the Court's decisions.

In the view that the judicial function should pay some deference to findings of fact as to customs of industry in applying this Act, I favored affirmance of the award to miners in the case of *Tennessee Coal Co.* v. *Muscoda Local*, 321 U. S. 590, because two lower courts had made findings of fact that under the contracts and conditions in those particular iron mines the employees were entitled to have counted as working time certain periods spent in travel. The judgment was supported, too, by the rulings of the Administrator. Those reasons were rejected by a majority of the Court which went on to lay down rules of decision which take no account of contract or custom.

Then came the case of *Jewell Ridge Corp.* v. *United Mine Workers,* 325 U. S. 161, in which the relationships were fixed by a deep-rooted custom in the industry of which both parties took account and embodied in collective bargaining agreements and which was reflected in the Administrator's rulings made at the request of the very union that was repudiating them. But a majority of the Court again rejected the contention that this Act was not intended to interfere with long-established customs which entered into collective wage agreements, and it reaffirmed a flat declaration as follows:

> "But in any event it is immaterial that there may have been a prior custom or contract not to consider certain work within the compass of the workweek or not to compensate employees for certain portions of their work. The Fair Labor Standards Act was not designed to codify or perpetuate those customs and contracts which allow an employer to claim all of an employee's time while compensating him only for a part of it. Congress intended, instead, to achieve a uniform national policy of guaranteeing compensation for all work or employment engaged in by employees covered by the Act. Any custom or contract falling short of that basic policy, like an agreement to pay less than the minimum wage requirements, cannot be utilized to deprive employees of their statutory rights." 325 U. S. at 167; *Tennessee Coal Co.* v. *Muscoda Local,* 321 U. S. 590, 602.

The same doctrine was then pressed into other fields of industry by the decision in *Anderson* v. *Mt. Clemens Pottery Co.,* 328 U. S. 680, which declared certain time spent on the premises of the Pottery Company must be compensated "regardless of contrary custom or contract." 328 U. S. at 692.

The Court evidently stands upon and reiterates the basic doctrine that the Act is one to regulate industry labor relations, for it says: "This Act contains its own definitions, comprehensive enough to require its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category." [1]

The claimants now before us ask to participate in the judicial largess. They believe that they are entitled to be paid for the time that they spent on the railroad's premises, under the railroad's direction, performing railroad labor, in order to learn to qualify for railroad jobs when the railroad might need them. The Court does not even attempt to distinguish the foregoing cases on which their claim is based.

This case again requires us to make a choice between grounds of decision similar to the choice that was open to us in the cited cases and I think it is timely for the Court to reconsider its approach to cases under this Act. We may purport to find grounds for denying these claims in an interpretation of the Act, although Congress never intended to regulate the subject at all. Or we can use as valid ground for denying these claims the concurrent findings by two lower courts of a good faith understanding of the parties, following a long-established custom of an industry whose labor relations have long been subject to collective bargaining. I concur only on the latter ground.

---

[1] I did not understand when I concurred in *United States* v. *Rosenwasser*, 323 U. S. 360, that it so held. It applied the Act to piecework employees. Piecework employment is a well-known form of employment that has existed perhaps as long as employment at a fixed hourly or daily wage. I understood, and still understand, the *Rosenwasser* case to hold only that this form of employment is not excluded from the terms of the Act.