**W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**SAN FRANCISCO & OAKLAND HELICOPTER AIRLINES, INC., a corporation, Defendant.**

**No. 41361.**

United States District Court
N. D. California, S. D.

Aug. 19, 1965.

Office of the Solicitor U. S. Dept. of Labor, San Francisco, Cal., for plaintiff.

Pillsbury & Dunlap, Edwin S. Pillsbury, Kenneth C. Nagel, San Francisco, Cal., for defendant.

HARRIS, Chief Judge.

This case arises under the provisions of the Fair Labor Standards Act of 1938,

as amended,[1] hereinafter called the Act, and relief is sought to enjoin the defendant, San Francisco and Oakland Helicopter Airlines, Inc., from violating the Act by paying certain individuals wages at rates less than the minimum hourly amount and for failure to keep, make and preserve records which would show hours worked, wages paid, and total straight time earnings with respect to these men. Whether the requested relief will be granted depends upon the single issue of whether an employment relationship, within the meaning of the Act, existed between the defendant and certain individuals who performed janitorial and porter work at the defendant's heliports.

Trial of the factual issues raised by this question was had before the court, briefs were submitted by the government and the defendant and the matter was submitted for ruling.

It appears that San Francisco and Oakland Helicopter Airlines, Inc., hereinafter referred to by its commercial abbreviation "SFO", began its operations in transporting passengers and baggage across and around San Francisco Bay in June of 1961. Heliports, organized and equipped like miniature airports, were opened, first, in downtown Oakland and later in Berkeley, and flight schedules were begun from and between these terminals which connected with the major airlines operating at the San Francisco and Oakland International Airports. There has been no dispute about the interstate character of these operations and the propriety of applying the Act to the defendant SFO.

Coincident with the start of the defendant's helicopter flights was the appearance of one Timothy Richardson who, although at this early period seemed harmless enough, was the precursor of the troubled events and this litigation which followed in his wake.

Richardson came to the defendant's downtown Oakland heliport and offered his services to the management. Although there is some conflict in the testimony, it appears that he was interested in securing permission to acquire an exclusive right to handle a porter concession at the heliport and to do the janitorial work there as well. A written contract[2] dated June 29, 1961, was entered into by Richardson and SFO which, in pertinent part, reads as follows: " * * contractor (Richardson) shall provide janitorial and custodial services at and around the heliport * * * " and " * * * contractor shall provide porter service at said heliport between the hours of 6:00 a. m. and 10:30 p. m. daily * * *." Further, the contract, stated, "Contractor shall perform his services under this agreement as an independent contractor * * * " Ordinary maintenance duties were spelled out in the agreement and Richardson was to bear his own expenses for his uniform and equipment. For his services, Richardson was to receive $25.00 per week from SFO and whatever gratuities or tips the passengers might provide for the porter service.

As the popularity of the SFO operation grew and the heliport was opened in Berkeley, Richardson hired several other individuals to do the routine clean-up work at the small terminals and to act as porters. He directed these other men to secure a porter uniform like his own, at the uniform specialty shop which made up SFO's pilot uniforms, and instructed them in the tasks they were to perform. He organized two shifts, one beginning at 5:30 a. m. and another at 2:30 p. m. and was present on the job himself much less frequently as time passed by. The new workers received no salary but only what could be garnered from passengers in tips. The evidence indicated that tips were not very good and averaged only $3.00 to $4.00 per shift.

SFO had, at this time, no record of the identity of these porter-janitors and it appears that the composition of the porters changed from time to time. While

[1]. 29 U.S.C. § 201 et seq.

[2]. Exhibit No. 4.

the men were at the heliports for long hours, some in fact working a double shift, it appears that the routine cleanup around the heliport premises, in total, took only a small fraction of their time. Most of their efforts were directed at meeting the frequent flights, carrying baggage, calling taxis for the passengers and helping to "tag" luggage in an effort to secure a tip. Occasionally, one or two of the porter-janitors had to be warned for "hustling" the passengers in a rude manner by the station agents.

Because the heliports were small, frequent contact and a friendly cooperation between SFO's regular employees, the station agents and the porter-janitors was inevitable. Station agents would point out certain conditions which needed attention by the porter-janitors, the porter-janitors would frequently "watch the store" while the agents went for coffee or drove to the bank; between the scheduled flight the time spent together evidences a conviviality growing out of this close association which is reflected in a letter, later referred to, wherein a group of station agents interceded in behalf of the porter-janitors when they requested financial assistance from SFO's president, Mr. Bagan.

On December 1, 1962, a letter was sent by four of Richardson's men to Mr. Bagan in an effort to secure "some kind of pay scale" [3] since tips were not very good. Some time thereafter, a letter [4] signed by three station agents was forwarded to Mr. Bagan indicating sympathy for their appeal and making reference to the fact, also supported by other evidence, that Richardson was attempting to obtain a commission from whatever tips the men earned for their porter work. Mr. Bagan called Richardson and the porter-janitor who had written the letter into his office and explained to them that SFO had recently secured a contract with the Federal Government

for carrying mail and in view of the fact that some assistance would be needed in loading and unloading the mail, he could pay $12.50 per week to the men who helped.[5] This apparently satisfied the porter-janitors and Richardson likewise received the $12.50 in addition to his $25.00 per week on the contract he had with SFO. Thereafter, those porter-janitors who helped unload the mail from helicopter to mail truck on the morning and evening flights received $12.50 per week until late April of 1963 when everyone was discharged pending resolution of this suit.

On occasion, as he was passing through the heliport, Mr. Bagan would make remarks about the job the porter-janitors were doing, sometimes favorably, sometimes not. Bagan specifically told Richardson to get rid of one or two of the men because they were sleeping near the heliport and had criminal records. Beyond this infrequent exercise of authority, however, Mr. Bagan did not interfere with the discharge of the contract entered into between Richardson and SFO.

It is the government's position that the foregoing facts demonstrate that an employment relation existed between the porter-janitors and SFO within the meaning of the "suffer or permit to work" provision of Section 203(g) of the Act and many cases have been cited in support of their position. Notably, are the Rutherford Food Corporation, et al v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772, and United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757, cases which indicate that the proper test to be applied in construing the Act is that of the economic realities of the case. That is to say, the true legal nature of the relationship between the porter-janitors and SFO is not one to be resolved according to technical common law distinctions and definitions, but rather is to be assessed according to the

---

3. Exhibit No. 1.

4. Exhibit No. 10.

5. Deposition of Timothy Richardson at page 54.

myriad of factors which underlie the actual economic reality of the situation.

Applying this test in case at bar, in the light of all the facts as developed by the extensive testimony, it must be found that these porter-janitors were in no sense the employees of SFO. Unlike the Rutherford case, the functions performed by these men were not an independent step in the essential operation of SFO, but rather amounted to a convenient activity performed on the periphery of this company's principal endeavor.

There was evidence that the kind of arrangement entered into by SFO and Richardson for the porter concession at the heliports was one usually followed by the major airlines and the practice of hiring a janitorial service, on an independent contractor basis, is familiar in many industries. Considering the fact that SFO was a struggling new business with its formation processes still in flux and its final organizational structure still inchoate, it is not inappropriate to cite the remarks of Mr. Justice Jackson in Walling v. Portland Terminal Co., 330 U.S. 148, 154, 67 S.Ct. 639, 642, 91 L.Ed. 809, when he stated:

> "Organized employees on one side, free of employer domination or coercion, and employers on the other side best know the needs and customs of their trades; they know something of the strain their industry can stand; and after all, it is they who feel the effects. Given thus the machinery to change customs that had outlived their time or, in the alternative, to adjust wage rates to take account of those customs, it was, I think, our duty to pay at least some deference to the customs and contracts of an industry and not to apply the Fair Labor Standards Act to put industry and labor in a legal straitjacket of our own design."

With full recognition of the principle, enunciated by the Supreme Court on many occasions, that contracts, however "skillfully devised", [6] should not be permitted to shift tax liability or avoid the application of statutory provisions and protections, it is still proper to give weight to commercial agreements honestly entered into and faithfully pursued. As long as the services and benefits required to sustain an industry are obtained through arrangements which are not obnoxious to the benign purposes and policies of the Act, as here, the independent contractor relation should be upheld. "Certainly the industry's right to control how 'work shall be done' is a factor in the determination of whether the worker is an employee or independent contractor." United States v. Silk, 331 U.S. at 714, 67 S.Ct. at 1468.

The sporadic and occasional nature of the directives and suggestions of Mr. Bagan and the station agents was insufficient to erode primary and continuous control exercised by Timothy Richardson over his crew. If the SFO executives thought the performance of an occasional porter-janitor unsatisfactory they looked to Richardson, their contractor, to rectify the situation.

Payment of $12.50 per week for loading and unloading the mail did not alter the existing independent contractor arrangement but was a separate and distinct employment of only those men who were on the premises at the time a mail flight came in. This limited employment of available porter-janitors to engage in this task for a *quid pro quo* comes within the rule of waiting to be engaged as outlined in the case of Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124. Here it is clear that the compensation paid by SFO was only for the performance of this task alone and not a general payment for all services theretofore being rendered in pursuance to the Richardson-SFO contract. Certainly Richardson, who was eager to preserve his status as exclusive concessionaire at

6. Lucas v. Earl, 281 U.S. 111, 115, 50 S.Ct. 241, 74 L.Ed. 731.

the heliports, would have objected to such a direct payment by the company to the men in abrogation of his contract rights.

The evidence is persuasive that while the porters at the Berkeley and Oakland heliports were not actually loading and unloading the mails, the defendant did not exercise "any supervision or control over the men"[7] and that "they were at liberty to leave the premises at any time they wished"[8] and each of the porters "was entirely free to follow his own personal activities".[9] Therefore, defendant's payment of $12.50 per week satisfied the minimum wage standards of the law for the performance of that task, and at no time either before or after January 1, 1963 were the porter-janitors entitled to receive any compensation beyond that actually paid them by defendant.

■■ "The definition 'suffer or permit to work' was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." Walling v. Portland Terminal Co., 330 U.S. 148, 152, 67 S.Ct. 639, 641, 91 L.Ed. 809. The porter-janitors here worked the heliports of the defendant for the sole purpose of securing to themselves gratuities or tips. They went to work for Timothy Richardson with the knowledge that this would be their only source of compensation. The benefits received by SFO for the rendering of this janitorial and porter service flowed from the contract made with Richardson for which they bargained and paid.

Accordingly, it is hereby ordered that judgment be entered in favor of the defendant San Francisco & Oakland Helicopter Airlines, Inc.

7. Gordon v. Paducah Ice Mfg. Co., D.C., 41 F.Supp. 980.

8. Arthur v. Emrick Well Servicing Co., 209 F.Supp. 491.

9. Thompson v. Daugherty, D.C., 40 F. Supp. 279.