James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

Paul OKADA and Okada Farms, Incorporated, a corporation, Defendants.

Civ. A. No. C–2911.

United States District Court, D. Colorado.

April 29, 1971.

Henry C. Mahlman and Ronald G. Whiting, U. S. Dept. of Labor, Denver, Colo., for plaintiff.

Eugene H. Tepley, Denver, Colo., for defendants.

MEMORANDUM OPINION

WINNER, District Judge.

Plaintiff charges that defendants have violated the Fair Labor Standards Act in the operation of defendants' farm on which they grow vegetables which are shipped in interstate commerce. Specifically, plaintiff charges violations of sections 6(a) (5) and 15(a) (2) [payment of less than $1.30 per hour]; sections 11(c) and 15(a) (5) [failure to maintain adequate records pursuant to 29 C. F.R. 516] and section 15(a) (1) [shipping goods in commerce with knowledge that employees had been employed in violation of the act]. Defendants deny these charges and assert that they grew cucumbers for Henderson Pickle Co., Inc.; that the cucumbers were grown from seed furnished by Henderson and that it was solely responsible for harvesting and hauling the cucumbers from defendants' field to the pickle plant, and that the pickers were employed by an independent labor contractor.

At a preliminary pretrial conference, defendants stated that it is imperative that they know before May 1, 1971, whether under the circumstances of this case, their employment of a labor contractor subjects them to the provisions of the Fair Labor Standards Act. To meet this claim of emergency, the matter was heard only on the question of coverage with a hearing on the other aspects of the complaint to follow if the Court finds that defendants are liable under the act for the employment of the farm laborers in question.

The Court finds:

Defendants operate a farm in Adams County, Colorado, on 52 acres of land owned by them and on 200 acres leased by them. Defendants grow several types of vegetables on the farm, and the cucumber crop is but a small part of the

total operation. Seed for the cucumbers is furnished by Henderson Pickle Co., and two types of seed were supplied. One type was to grow cucumbers to be machine harvested, and the other was to grow cucumbers for hand harvesting. It is the hand harvested cucumbers which give rise to the present controversy.

Defendants have done business with the Henderson Pickle Co. for several years under an oral agreement. Defendants plant the seed supplied by Henderson and they are responsible for growing the crop. In the year in question they were to be paid $1.25 per cwt. for the merchantable crop and $.125 for the less desirable part of the crop, with the oversize cucumbers to be left in the field.

In 1970, one Frank Pena acted as a labor recruiter for Great Western Sugar Co. and for Henderson Pickle Co. He would recruit migrant farm laborers to come to Wyoming and Colorado to work in the fields, and it was through his efforts that a crew under the supervision of Ramon Medelez worked at Okada Farms during the summer of 1970. This crew was made up entirely of members of the Medelez family, and, in the words of defendants in their brief, "Ramon Medelez was the Patriarch of the tribe—all the workers were related to him as sons, daughters, brother, nieces and nephews, or in-laws." [Proof that all crew members were part of the "immediate family" of Medelez was lacking.] The Medelez crew had been working beets in Wyoming, and it then came to Brighton where it was assigned to the Okada Farm. There the crew lived in quarters located on the leased land which, Okada testified, were to be maintained by Henderson Pickle Co. The assignment of the crew to the Okada Farm was made by Pena, and he was the person who explained to Ramon Medelez that payment was to be made to him at the rate of $1.25 per cwt. for the merchantable cucumbers picked.

The owner of Henderson Pickle Co., one Imatani, testified that his company

contracts with the growers to grow cucumbers; that his company recruits crew leaders to harvest the cucumber crops of the growers, and that checks are issued by his company to the crew leaders on the basis of the weight of the merchantable produce picked. Apparently the only books and records maintained in connection with the harvesting of the cucumbers are those maintained by Henderson Pickle Co., and these are limited to records as to the weight of the cucumbers delivered to the plant. Imatani stated that it would be impossible for him to maintain records of the hours worked by each laborer for the reason that someone would have to be present at each farm to accomplish this record keeping.

Typical of the practice among the growers, the work crews worked part time on the beet and onion crops grown by defendants, and for this work they were paid by Okada on an hourly basis. Although Okada said that defendants exercised no control over the workers while they were harvesting the cucumbers, the workers testified to the contrary, and the Court finds that the only regular supervision of the farm workers while they were harvesting the cucumbers came from the Okadas, and that on at least one occasion, the senior Okada threatened to discharge one of the migrant farm workers.

Representatives of plaintiff called at defendant's farm on two or three occasions and advised defendants that in the opinion of those representatives defendants were in violation of the Act. During these visits, literature was delivered to defendants by the labor department investigators, and defendants contend that this literature assured defendants that their practices exempted them from complying with the law. This literature forms a part of the record in the case as Plaintiff's Exhibit 11 and Defendant's Exhibit A. Neither of these exhibits is a part of the Code of Federal Regulations. Defendants rely heavily on Exhibit A which sets forth on page 8 certain tests to be applied. As is said in

that exhibit, "Whether a crew leader or a labor contractor is the employer of the workers he supplies is a question of fact." Defendants' Exhibit A is entitled, "Farmer's Guide to The Agricultural Provisions of The Fair Labor Standards Act," and it notes on its cover sheet that it "is not to be considered in the same light as official statements of position contained in Interpretative Bulletins and other such releases formally adopted and published in the Federal Register." Title 29, Part 791 of the Code of Federal Regulations represents the official interpretation of the 1966 amendments to the Fair Labor Standards Act applicable to agricultural labor, and it provides in material part:

"Section 791.2 Joint Employment

"(a) A single individual may stand in the relation of an employee of two or more employers at the same time under the Fair Labor Standards Act of 1938, since there is nothing in the Act which prevents an individual employed by one employer from also entering into an employment relationship with a different employer. A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employments for purposes of the Act depends upon all the facts in the particular case. If all the relevant facts establish that two or more employers are acting entirely independently of each other and are completely disassociated with respect to the employment of a particular employee, who during the same workweek performs work for more than one employer, each employer may disregard all work performed by the employee for the other employer (or employers) in determining his own responsibilities under the Act. On the other hand, if the facts establish that the employee is employed jointly by two or more employers, i. e., that employment by one employer is not completely disassociated from employment by the other employer(s), all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the Act. In this event, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions with respect to the entire employment for the particular workweek. * * *

" * * *

"(b) Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:

"(1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or,

"(2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or,

"(3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer."

The statute, 29 U.S.C. § 203 was amended in 1966. As amended, it provides:

"(d) 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee * * *

"(e) 'Employee' includes any individual employed by an employer, except that such term shall not, for the purposes of subsection (u) of this section include:

"(1) any individual employed by an employer engaged in agriculture if such individual is the parent, spouse, child, or other member of the employer's immediate family, or,

"(2) any individual who is employed by an employer engaged in agriculture if such individual (A) is employed as a hand harvest laborer and is paid on a piece rate basis in an operation which has been, and is customarily and generally recognized as having been, paid on a piece rate basis in the region of employment, (B) commutes daily from his permanent residence to the farm on which he is so employed, and (C) has been employed in agriculture less than thirteen weeks during the preceding calendar year. * * *

"(g) 'Employ' includes to suffer or permit to work."

As was said in United States v. Rosenwasser, 323 U.S. 360, 65 S.Ct. 295, 89 L.Ed. 301, "a broader or more comprehensive coverage of employees within the stated categories would be difficult to frame."

A farmer who uses less than 500 man days of farm labor in a calendar quarter is not required to comply with the act, (and days worked by members of the employer's immediate family are not counted in arriving at the 500 man days) but this exemption need not concern us if the farm laborers here in question are employees of defendants under the definitions contained in the Fair Labor Standards Act.

The landmark decision under the Fair Labor Standards Act is Rutherford Food Corp. v. McComb (1947) 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772. Rutherford had there entered into a contract with one Reed under which he assembled a group of skilled boners to do the boning in the slaughterhouse. The contract provided that Reed would be paid by the hundredweight of boned beef; that he would have complete control over the boners who would be his employees and that the plant operator would furnish a place to work. Later, others took over Reed's contract, and for the most part the profits were shared with the boners. "The Administrator thought these facts brought the boners within the classification of employees, as that term is used in the Act. But the District Court thought that they were independent contractors, and denied the injunction sought by the Administrator." The Court of Appeals reversed, and the Supreme Court affirmed the Court of Appeals, saying:

"The definition of 'employ' is broad. It evidently derives from the child labor statutes and it should be noted that this definition applies to the child labor provisions of this Act, § 12. We have decided that it is not so broad as to include those, 'who, without any express or implied compensation agreement, might work for their own advantage on the premises of another.' Walling v. Portland Terminal Co., 330 U.S. 148, 152, [67 S.Ct. 639, 91 L.Ed. 809] decided February 17, 1947. In the same opinion, however, we pointed out that 'This Act contains its own definitions, comprehensive enough to require its application to many persons and working relationships which, prior to this Act, were not deemed to fall within an employer-employee category. 330 U.S. 148, 150 [67 S.Ct. 640]. We have said that the Act included those who are compensated on a piece rate basis * * * We conclude however that these meat boners are not independent contractors.' * * *

[The Court then quoted from the opinion of the District Court and continued:]

"We think, however, that the determination of the relationship does not depend upon such isolated factors, but rather upon the circumstances of the whole activity. Viewed in this way, the workers did a specialty job on the production line. The responsibility under the boning contracts without material change passed from one boner to another. The premises and equipment of Kaiser were used for the work. The group had no business organization that could or did shift as a unit from one slaughterhouse to another. The managing official of the plant kept in close touch with the operation. While profit to the boners

depended upon the efficiency of their work, it was more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor. Upon the whole, we must conclude that these meat boners were employees of the slaughtering plant under the Fair Labor Standards Act."

Both sides argue the effect on this case of Mitchell v. Hertzke (10 Cir.), 234 F.2d 183. There, bean pickers were involved, and the defendants were three in number. Hertzke & Sons were growers under contract to supply snap beans to Kuner-Empson. That company packed the beans, and, as to it, the Court said:

"Whether Kuner-Empson is an employer must be determined from the relationships in this industry and from a consideration of the facts and circumstances under which pickers are employed. The relationship between Kumer-Empson and the Hertzkes is the same general relationship as between Kuner-Empson and all the contract bean growers. Kuner-Empson enters into one season contracts with the Hertzkes and some 200 other growers to assure a supply of vegetables for its canning plants. The Hertzkes' contract which is typical of such agreements provides that the Hertzkes should raise on designated lands 10 acres of stringless beans, which were to be delivered, when harvested, to Kuner-Empson. * * *

"The growing and picking of beans is a seasonal operation of short duration. It requires a considerable amount of labor which must be available and ready when needed. It is of great importance to all concerned that an adequate supply of labor be available at the right time. To bring this about the processors' association and the growers' association cooperate with the Colorado State Employment Service to insure an adequate supply of labor. The State Employment Service sends recruiters into other states, particularly Texas, to solicit workers. * * *

"According to the uncontradicted testimony, Kuner-Empson does not attempt any direction to the growers as to how the harvesting is to be done or who is to be hired to do it. It directs only the time when the harvesting is to begin. Many of the growers have available their own labor; or assemble and direct their own crews. Approximately 60% of the growers dealing with Kuner-Empson use the crew chief system while 40% do not. If the grower does not desire to obtain his own crew for harvest, he notifies either the Colorado State Employment Service or Kuner-Empson. A request received by Kuner-Empson from one of its growers for labor is relayed to the Employment Service or to a crew chief who then provides the required labor to the grower.

"Apparently the Hertzkes notified Kuner-Empson as to their need for laborers and it in turn notified Rodriguez, who furnished the labor to the Hertzkes. Rodriguez had no connection with Kuner-Empson other than the fact that he had worked for various of its growers in years past."

Rodriguez was the labor contractor similar to Ramon Medelez in this case. The Tenth Circuit Court of Appeals there held that Kuner-Empson was not an employer within the meaning of the Act, but the District Court there held that both Hertzke & Sons and Rodriguez were employers within the meaning of the Act. The Court additionally said:

"We take judicial knowledge of the fact that the administrator is dealing with a situation involving a large number of persons engaged in raising seasonal vegetables and produce and that the harvesting thereof covers only a comparatively short period of time. Significant also is the fact that beans are picked largely by itinerant labor and that much of the work is done by family groups, consisting of

the husband, his wife, and generally their minor children. There is present a danger that under age minors may be employed and it is quite easy and convenient to become careless as to the exact age of the workers. Neither are we unmindful of the fact that because of the nature of the industry and because of the character of the laborers who go from bean patch to bean patch detection of violations is difficult * * *

"On the showing in this record the trial court should have issued an injunction against the Hertzkes and Rodriguez enjoining them from violating the record keeping provisions of the Act, and the regulations promulgated pursuant thereto."

In Tobin v. Anthony-Williams Mfg. Co. (8 Cir.), 196 F.2d 547, defendant was engaged in the business of producing and selling hardwood lumber. It entered into agreements with former employees under which they contracted to haul timber at an agreed rate per thousand board feet in trucks which they purchased from defendant. Without fully detailing in this opinion the facts there involved, the Court there held:

"Applying that general test, we think that the haulers and woods workers in this case must be held to be employees. Defendant, in effect, controls their activities. They are directed where and what to cut. The amounts of their deliveries are determined by the work of defendant's loader and by the capacity of defendant's storage facilities. The haulers have no substantial investment in their trucks, and their ownership is no more than nominal. They cannot use the trucks for other than defendant's business, even on days they are not working for the defendant. Defendant does not furnish the woods workers with saws and axes, but the teams necessary are furnished and owned by defendant. The haulers have small chance of any large financial return, and do not incur losses. Admitted employees perform identical work."

Defendants stress the case of Continental Bus System, Inc. v. N. L. R. B. (10 Cir.), 325 F.2d 267. In that case, a bus depot operator was held to be an independent contractor. The facts there involved differ materially from those found by the Court to here exist, and a different statute and different statutory definition was there considered. The case is not in point.

The Court finds and concludes that within the meaning of the Act Ramon Medelez and defendants were joint employers of the farm laborers in question. The requisite degree of control by defendants was established, including the threatened exercise of the right to fire an employee, plus the right to direct the daily labor on the farm. Henderson Pickle Co. did not have any representative present during the daily operations, and it falls more nearly in the classification of Kuner-Empson in Mitchell v. Hertzke, supra.

Defendants employed farm labor for a sufficient number of man days to bring them within the coverage of the Act and of all of its provisions, and they were required to comply with all of the provisions of the Act insofar as members of the Ramon Medelez crew were concerned.

Plaintiff has shown repeated violations on defendants' part, and counsel for plaintiff are directed to submit a form of injunctive decree. The evidence as to monetary amounts has not been fully presented, and the case will be set for further hearing to determine those amounts if the parties are unable to agree on the amounts. Counsel are directed to notify the Court on or before June 1, 1971, as to whether they have reached agreement on the amounts in question.