Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

AMERICAN AIRLINES, INC., a corporation, Defendant.

Civ. A. No. CA-3-79-1527-G.

United States District Court,
N. D. Texas,
Dallas Division.

May 19, 1981.

Donald Hill, Barbara Heptig, Attys., Office of the Solicitor, U. S. Dept. of Labor, Dallas, Tex., for plaintiff.

Glen Walker, American Airlines, Inc., Legal Department, Dallas-Ft. Worth Airport, Tex., and Louis P. Bickel and Thomas L. Case, Bickel & Case, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

PATRICK E. HIGGINBOTHAM, District Judge.

The Secretary of Labor here contends that the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 *et seq.*, requires American Airlines, Inc. ("American") to pay the minimum wage to flight attendants and airline reservation sales agents while they are full-time students in an American learning center. Most of the underlying facts are undisputed.[1]

1. The following facts were stipulated in the Pre-Trial Order:
   A. During the period since December 15, 1976, American has been doing business in Dallas County, Texas, and since on or about August, 1979, has had its principal place of business in Dallas County, Texas.
   B. During the period since December 15, 1976, American has been an enterprise engaged in commerce within the meaning of section 3(s)(1) of the Act.
   C. During the period since December 15, 1976, American has had an annual gross volume of sales made or business done of not less than $250,000.
   D. American is a carrier by air subject to the provisions of 45 U.S.C. §§ 181–188.
   E. American is an air carrier engaging in interstate and overseas air transportation under a Certificate of Public Convenience and Necessity or other appropriate economic authority issued by the Civil Aeronautics Board (CAB).
   F. American is a certificate holder within the meaning of 14 C.F.R. Part 121, subparts G, M, N, O and T and subject to the provisions of that Part.
   G. Federal aviation regulations provide that the persons constituting the minimum complement of flight attendants required by 14 C.F.R. § 121.391 must have received the training specified by those subsections of 14 C.F.R. §§ 121.415 & 121.421 applicable to flight attendants and the type of aircraft on which they serve as flight attendants.
   H. The flight attendant training program for safety and emergency procedures required of a Part 121 certificate holder must be approved by the Administrator of the Federal Aviation Administration.
   I. Flight attendants constitute crew members within the meaning of 14 C.F.R. §§ 121.381, 121.391 & 121.421 and may constitute crew members within the meaning of certain other sections of 14 C.F.R. Part 121.

We can quickly dispatch the predicate to this court's jurisdiction. This court finds as follows:

1. Section 17 of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 *et seq.*, gives the court jurisdiction over this suit.

2. Since December 15, 1976, American has had employees engaged in commerce, including employees who have handled goods or materials that have moved in commerce.

3. American is a carrier by air subject to the previous of 45 U.S.C. §§ 181–188.

4. American is an air carrier engaging in interstate and overseas air transportation under a Certificate of Public Convenience and Necessity or other appropriate economic authority issued by the Civil Aeronautics Board.

5. American is a certificate holder within the meaning of 14 C.F.R. Part 121, subparts G, M, N, O and T and subject to the provisions of that Part.

6. Federal aviation regulations provide that the persons constituting the minimum complement of flight attendants required by 14 C.F.R. § 121.391 must have received the training specified by those subsections of 14 C.F.R. §§ 121.415 & 121.421 applicable to flight attendants and the type of aircraft on which they serve as flight attendants.

7. The flight attendant training program for safety and emergency procedures required of a Part 121 certificate holder must be approved by the Administrator of the Federal Aviation Administration.

8. Flight attendants constitute crew members within the meaning of 14 C.F.R. §§ 121.381, 121.391 & 121.421 and many constitute crew members within the meaning of certain other sections of 14 C.F.R. Part 121.

*Flight Attendants*

Twenty-four years ago, American opened its "Stewardess College" at Fort Worth, Texas. Other than its change to a flight attendant training program, reflecting the airline's move to gender neutrality, and some changes in teaching methods, the program has remained the same. Flight attendant trainees receive five weeks of training conducted in the classrooms and aircraft mock-up facilities in the Learning Center. Training is conducted in an academic environment much like the setting of a college campus but with a more intense regimen. Roughly forty percent of the curriculum is devoted to training which the Federal Aviation Administration ("FAA") requires of flight attendants on passenger air carriers, 14 C.F.R. Part 121. The balance of the curriculum is devoted to a variety of subjects including the preparation and serving of meals and drinks, grooming, interpersonal relationships, and aviation history. During the five week training period, students reside in dormitory facilities, receiving both room and board at no expense to them. This educational setting is wholly independent of the airline operation in the sense that no flight attendant trainee replaces or supplements the work of any American employee or otherwise performs any task immediately useful to American. Otherwise stated, there is no on-the-job-training aspect to the five week course. Attendant trainees do not assist on commercial flights, nor do they have contact with passengers, except for two observation trips, one in which trainees fly as passengers, and one orientation flight required by the FAA. In the orientation flight, a trainee wears civilian clothes and is identified by a trainee badge. Even then the student serves as an extra crew member during the minimum two and one-half hour flight segment and replaces no civilian employee.

The Department of Labor in this suit challenges American's practice of not paying students during the five week training period. American does furnish direct subsistence, consisting of meals, lodging, ground transportation, laundry service, security service and recreational facilities.

American explains that the subsistence is provided because the students are in school full-time and, therefore, are not earning income during their training, and because they usually come from places distant from the school. While the students are expected to reside at the Learning Center and take their meals there, they are not required to do so. Some stay at home or with friends in the Dallas-Fort Worth area, and commute to and from the Learning Center.

Contrary to veiled suggestions by government counsel, the students are hardly "serfs" in a fiefdom such as described some coal and ore mine employers of the late 30's and 40's. In fact, when employed, a flight attendant becomes a member of a powerful union. That union has made no contention in this suit that its protective wing ought to be extended to these students. The position of a flight attendant, in fact, appears to be a highly desired one. So much so, that supply and demand forces of the relevant labor pools favor American as demonstrated by the statistic that during relevant times, there were 70,000 applicants each year for the 800 trainee slots. But it cannot fairly be said that most of these eager applicants are unfamiliar with the conditions of the training they seek. Each accepted applicant acknowledges, in writing, that they are not an employee while in training and are not compensated as such. They are told explicitly that successful completion of the training program is a prerequisite to ultimate employment, a condition supported by the fact that as many as 20% of those accepted fail to complete the training.

While it appears that many applicants have contrary expectations, the airline expressly informs applicants that successful completion of the school does not guarantee a job. American denies that it was obligated itself to hire the trainees, pointing out that on occasion it has not employed successful graduates. No job was offered to an entire class of attendants who completed training in the summer of 1980. On other occasions, positions were not available immediately after graduation, and the trainees were not offered paid employment until

positions opened. Yet, despite the airline's efforts, some applicants believed that on entering the training program they were assured of a position as a flight attendant if they successfully completed the training. Present recollections of that "belief" arguably are supported by the fact that many trainees left secure positions of employment, forfeited rental deposits, and did other things consistent with a confidence that a new job was forthcoming. Their confusion is an anticipatable by-product of both the historical fact that, with few exceptions, successful completion of the training did result in employment as an American flight attendant, as well as the failure of eager applicants to focus upon American's disclaimer of any obligation to hire graduates.

That successful completion of training did, in fact, virtually ensure employment of all graduates is no accident. American is careful to match its forecasted need for flight attendants with the number of accepted applicants to avoid unnecessary training or attendant shortages. Recent economic difficulties of the airlines to one side, it is the accuracy of this match between anticipated and actual needs that has operated to ensure employment of virtually all successful trainees.

Training similar to that offered by American is available at over fifty other institutions, including preparatory schools and junior colleges. There are differences, however, because the flight attendant training at the American training center is tailored to the needs of American. For example, the basic required FAA training is given, but much of the additional time is devoted to teaching policies and practices of American. Flight attendants in American's course are trained only to work in aircraft flown by American. At least one junior college offering flight attendant training, however, periodically reviews American's program in determining its own curriculum.

While many of the learned skills are unique to American, many are transferable. Yet, industry practice is to require all applicants to be trained in each airline's own school. Although a transferring trainee would substantially replicate earlier training, the requirement does not stem from a judgment that the skills are not transferable, but from the fact that there are insufficient numbers of transfers to justify creating a supplemental training program separate from the regular curriculum. The court is persuaded that a substantial percentage of flight attendant skills acquired through the American school (there was testimony that all other major airlines have substantially the same training program) is fully fungible.[2] An American flight attendant employed by another airline would require only a minimum of training to be prepared fully to assume flight attendant duties. Non-transferability is then not so much a product of the "uniqueness" of training but the unwillingness of the airlines to offer training tailored to transferees. This refusal is bottomed upon the economic reality that given the relatively low number of applicants who are graduates of other airline schools, the marginal costs operate in favor of "full retraining" rather than creation of separate schools. It is against this background of economic reality that the uniqueness of the training question must be viewed.

Parts of the American flight attendant training program are sufficiently fungible that other air carriers have sent their trainee flight attendants to American's Learning Center for partial training identical to that provided the American trainees. American, of course, is paid by the contracting carriers for such training.

Finally, private corporate "airlines" have been hiring laid-off American flight attendants with no or little retraining, relying largely on the training initially provided by American.

2. There is no easy way to quantify the skills and thereby numerically express a fungible quantity. Despite the current vogue of the numerical array, intuitive deduction retains a vital role in the fact finder's tool kit. I suspect a larger role than that admitted.

The cost of training itself suggests that the market place recognizes the transferability of flight attendant training. The schools offering training similar to that of American are not cheap; and there are sufficient numbers of persons willing to pay for the training to support the institutions offering it. Even with the closely managed American school, the training of a flight attendant is expensive. While the techniques of cost accounting were debated at trial, it cost American several hundred dollars to train a flight attendant.

### Reservations Sales Agents

At the same training center, American trains approximately 1,000 reservation agents annually from among approximately 30,000 applicants. As with flight attendants, each applicant for reservation agent acknowledges, in writing, that they are not an employee during training, and acceptance for training is not an offer of employment by American.

Reservations agent trainees receive three weeks of training conducted in special classrooms equipped with computer terminals in American's Learning Center by a staff of professional instructors. Training is conducted in an academic environment—the same kind of training offered at vocational schools. The training is similar to the reservations agent course offered for a tuition payment of $1,600 at the nearby Braniff Educational Systems, Inc., in Dallas. Approximately 75% of the course covers operation of computer console equipment identical or similar to the computer consoles operated by most major airlines, travel agencies and corporate travel departments. The balance of the training covers a variety of subjects, including sales techniques, airport designations and computation of airline fares, all of which relate directly to duties performed by reservations sales agents of any major airline or travel agency. Similar training of a more advanced nature is given to approximately 8,000 travel agency employees each year on a contract basis. The reservations agent training includes no contact with customers, except for a brief period ending in early 1977, when reservations agent trainees, under the direct supervision of instructors, handled a limited number of customer calls during their third week of training. If and when trainees are offered employment with American, and are placed on payroll, they receive additional on-the-job training for approximately one week at one of the five reservations centers to which they are assigned. During this on-the-job training they, of course, perform productive work for American, responding to passenger calls and performing other duties.

Reservations trainees are not obligated to accept employment with American at the conclusion of their Learning Center training; some drop out or decide on other employment after graduation. By the same token, American is not required to, and does not offer employment to all individuals who complete training. In 1977, 1978, 1979 and 1980, the percentage of trainees successfully completing training was approximately eighty-five to ninety percent.

During the three weeks of their training, the trainees receive no wages or other compensation. The direct subsistence provided by American—meals, lodging, ground transportation, laundry, security service and recreational facilities—is given because the trainees must attend full-time and usually have no income, and because many travel to the Center from distant points. Most trainees reside at the Learning Center and take their meals there, but they are not required to do so, and, in fact, many have chosen to live at home or elsewhere in the Dallas-Fort Worth area and commute to and from the Learning Center.

Having described the two American schools as seen by this court, we turn to the legal questions. The issue joined is whether flight attendant trainees and reservations sales agent trainees are, while in training at the Learning Center, "employees" within the meaning of the Fair Labor Standards Act of 1938, as amended. The Act defines employee as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). " 'Employ' includes to suffer or to permit to.

work." *Id.* § 203(g). This tautological text provides little specific guidance. Such guidance as exists is found in a handful of decisions by the United States Supreme Court and a few appellate and district court decisions coupled with the interpretation of the Act by its administrator. We will briefly review the principal cases and then examine the Labor Department interpretations. Despite their sparse number and distinct factual patterns, these cases chart a decisional path, albeit a hazy one, to the proper statutory construction.

The decisions of the Supreme Court in the 1940's instruct that the concept of employee is not defined by common law principles; the Act is to be read with the cold eye of economic reality. The inquiry perforce is, a fact-by-fact addition and subtraction with the final sum falling to one side or another of an ultimately arbitrary line between employee and trainee.

Until the mid-1940's, most ore and coal miners were paid only after reaching the face of the coal or ore vein. The companies did not pay them during their travel from the mine entry to the "face" because, in the companies' view they were traveling to and from work, not working. Traveling miners were not paid despite their exposure to the hazard of the mine and the fact that when they entered the mine, the miners were under the control of the employer. The question was when is an admitted employee so engaged in the affairs of his employer that his effort must be compensated. The ore mines case reached the Court first and in *Tennessee Coal, Iron & Railroad Company v. Muscoda Local No. 123*, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949 (1943); time traveling was held to be compensable employment. The Court emphasized three points of inquiry: (1) physical or mental exertion (whether burdensome or not); (2) controlled or required by the employer; and (3) pursued necessarily and primarily for the benefit of the employer and his business. *Id.* at 598, 64 S.Ct. at 703. The ore mining case was followed in the coal mining industry. *See Jewell Ridge Coal Corp. v. Local No. 6167*, 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534 (1945). Two years later, the Court decided two trainee cases finding in both that the trainees were not employees. *See Walling v. Portland Terminal Co.*, 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947); *Walling v. Nashville, Chattanooga & St. Louis Railway*, 330 U.S. 158, 67 S.Ct. 644, 91 L.Ed. 816 (1947). In *Portland Terminal*, the question was the employment status of brakeman trainees. The railroad advertised for trainees through the newspapers. Persons who applied completed an application, took an eye examination and, at their own expense, a physical examination.

The railroad required a period of training before employment.[3] The training consisted of an individual observing the work done in the yard and simulating it. Trainees did not displace actual workers on the job. Upon successful completion of the several weeks of training, an applicant's name went on an "extra board" from which their name might be drawn for hire. The Court noted that despite the fact that the training program benefited the employer by allowing it to obtain a pool of qualified workmen to be drawn upon, the Act:

> cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction. Had these trainees taken courses in railroading in a public or private vocational school, wholly disassociated from the railroad, it could not reasonably be suggested that they were employees of the school within the meaning of the Act. Nor could they, in that situation, have been considered as employees of the railroad merely because the school's graduates would constitute a labor pool from which

---

**3.** The trainees were required to complete an application which provided:

> It is agreed by me to serve for at least two weeks under the instructions of a conductor for the purpose of learning the duties and qualifying for such position, employment to be subject of [sic] passing required examination on the applicable rules, the working rules and regulations as from time to time applied, and the approval of the designated officer.

61 F.Supp. 345, at 346.

the railroad could later draw its employees. The Fair Labor Standards Act was not intended to penalize railroads for providing, free of charge, the same kind of instruction at a place and in a manner which would most greatly benefit the trainees.

330 U.S. at 152–53, 67 S.Ct. at 641.

Mainline firemen, brakemen and switchmen were similarly treated in the companion case of *Walling v. Nashville, Chattanooga & St. Louis Railway, supra. Walling* dealt with the railroad policy of requiring their firemen, brakemen and switchmen to "cub". "Cubbing" is a railroad phrase describing a period of training by which trainees accompanied regular crews observing and performing their duties under the supervision of regular employees. This period of cubbing or training occasionally extended to four, five and six weeks. Justice Black's opinion dealt both with the question of the understanding between the trainee and the company as well as the benefits flowing to each. The Circuit Court of Appeals' language in the favorably cited decision of *Walling v. Jacksonville Terminal Co.*, 148 F.2d 768 (5th Cir. 1945), is instructive:

> The agreement was made in good faith and represented the truth of the relationship. The trainees are not child-laborers, nor economically oppressed persons, nor in danger of injury by substandard living during the short period of training. The regular employees have all been trainees, and are now members of the powerful unions of railroad men. . . . These unions recognize the trainee's status and their contracts with the Company provide for the acceptance of them as employees. No abuse sought to be remedied by the Fair Labor Standards Act appears.

*Id.* at 770.

The Appeals Court also responded to an argument that has been made by the government in this case:

> It is said that there is an indirect and ultimate benefit to the Company from the training in that it supplies a pool from which to draw competent employees

when needed. If such employees should be in demand, so that the Company were seeking trainees instead of trainees seeking permits to train, a different arrangement might result under which training with pay might be agreed on. Apparently that is not now the case; certainly that is not the present basis of the training. Our task is but to ascertain the arrangement the parties have made and apply the law to it.

*Id.*

These early cases have been followed by the lower courts. *See Ballou v. General Electric Co.*, 433 F.2d 109 (1st Cir. 1970). There the contention was made that the Fair Labor Standards Act applied to apprentices during the time that they were attending classes to further their learning skills. The First Circuit noted that General Electric paid the apprentices when they were actually performing work for the benefit of the employer, but did not do so during their training. *Id.* at 112. *See also Marshall v. Allen-Russell Ford, Inc.*, 488 F.Supp. 615 (E.D.Tenn.1980).

Some operating principles can be gleaned from the cases:

(1) Congress intended that persons doing the work of an employee be paid the minimum wage and otherwise enjoy the protection of the Act without regard to labels. That is, calling such work travel time or ascribing a status such as trainee or student will not control even if the label or status is formalized as a contract. Otherwise stated, the court will look to the "reality" of the relationship.

(2) That a relationship has been by custom or tradition, one of non-employee is not controlling, of itself. This is so even though that custom or tradition is recognized by such common law distinctions as employee versus independent contractor.

These gleanings, however, provide at best definitions of what will not override a "true" employer-employee relationship. They provide relatively little attention to the core relationship that the Act protects; that is, the economic reality we seek. Such

attention as does exist is little more than the labeling decried by the courts in their efforts to say what an employer-employee relationship is not. The cases emphasize (1) a right of control by an employer over the work of the employees as to how and by whom the work will be performed; and (2) the relative benefit to the employee and the employer of the controlled activity of the employee; that is, the direction of flow of primary benefit relative to the mission of the employer.

■ The Wage & Hour Administrator, in § 10(b)11 of the Wage & Hour Division Field Operations Handbook, draws six criteria from the *Portland Terminal* and *Nashville* cases. They are:

(1) the training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school;

(2) the training is for the benefit of the trainees or students;

(3) the trainees or students do not displace regular employees, but work under their close observation;

(4) the employer that provides the training derives no immediate advantage from the activities of the trainees or students, and on occasion his operations may actually be impeded;

(5) the trainees or students are not necessarily entitled to a job at the conclusion of the training period; and

(6) the employer and the trainees or students understand that the trainees or students are not entitled to wages for the time spent in training.

*See Op. Wage-Hour Adm'r*, No. 1306 (WH–254) (Feb. 22, 1974).

■ Because our draw from the cases is not materially different from that of the Wage & Hour Administrator, our task is to apply the six criteria. Application of the six criteria here favors American. First, as earlier described, a substantial part of the actual training given is similar to that available in vocational schools. Teaching is by qualified instructors pursuant to a regimen operating separately from the work premises. It is plainly and simply a school. Undoubtedly, the immediate primary benefit flows to the students themselves. The students become qualified as crew members on Boeing 707's, 727's, and 747's and McDonnell Douglas DC–10's. Reservations agents learn computer skills, fare computation and sales techniques that qualify them for reservation agent jobs on any airline and many travel agencies. At the same time, as we noted, many of the flight attendant skills, while transferable, are not by industry practice accepted in lieu of "retraining."

The government argues that this uniqueness of training for the needs of American is a weighty factor in the decisional process. We find little in the history of the Act or in the prior cases that suggests that employer offered training to develop skills unique to the employer's operations necessarily demands Fair Labor Standards Act protection. But we need not reach so far because we have found the skills acquired by students at the training school to be substantially fungible. And while some of their required skills are not transferable, but are of value only as an employee of American, the package of non-transferable skills includes skills not transferable because it is cheaper to repeat training than separately to supplement it, not because the skills are inherently unique to American. We do not deem it irrelevant that part of the skill acquired in the flight attendant training is unique. We observe only that the transferability of training, while conceptually relevant to the relative benefit inquiry, is not sufficiently substantial to be controlling here.

If the ultimate issue, as we believe it to be, is whether American has effectively assimilated these trainees into its work force in such a fashion that they are employees in economic reality, then an important analytical focus must be the relative benefits flowing to trainee and company during the training period. In measuring the major direction of benefit flow between an employer and a putative employee, both the courts and the Wage & Hour Administration have divined two principles important

in the inquiry. First, there be some displacement of conceded employees by the "trainee". Second, proof of benefits to an employer from creating a readily available pool from which to hire is not, of itself, sufficient to trigger the Act. The government concedes it here faces these hurdles, asserting it can and has cleared them. It argues that the absence of worker displacement found earlier is but a predictor of relative benefit which is overcome by proof that American, and not the students, was the beneficiary of the schooling.[4] That proof, it contends, is found in the fact that the composition of and the training afforded the pool is determined by American's needs and not the needs of the industry.

We agree that there is no talismanic quality to the inquiries but are persuaded that the government's argument otherwise founders. The government's elaborate statement of the benefit to American is ultimately based upon two poles: first, American's matching of its needs with the number of applicants; second, an emphasis upon the substantial skills taught at the schools that are only of benefit to the students as employees of American.

With both flight attendants and reservation trainees, no immediate direct benefit flows to the company during the actual period of training; to the contrary, the schools are an expense to the employer. The day to day tasks performed by the trainees do nothing to further the interest of the company except in the ultimate sense that American eventually receives benefit indirectly from the enhancement of the trainee's skill level. The flight attendants do not fly and the ticket sellers do not sell. And neither the case law nor the Labor Department interpretation of the Act has instructed that the benefit flowing from the creation of a trained labor pool is itself sufficient to push trainees into an employment status. The court finds the absence of employee displacement and the expense of the training turn the benefit flow in the direction of the employee.

If the creation of a labor pool alone is not a sufficient benefit, perfecting it in a fashion to mesh with a company's employee needs does not make it more so. Nor is it clear why a high probability of ultimate employment ought to alter the status in the pre-employment period when, as here, trainees agreed that during their period of training they would not be paid, that they were not employees, and that future employment depended upon successful completion of training. In giving weight to the written understanding of American and its students, we do not *in this context* do violence to the principle that company labels, even those formalized into agreements, do not determine who is an employee. Instead, we find the existence of explicit agreements that American's students were not employees, though not binding, refute any inference that might be drawn from an agreement that the students were employees. While agreements that persons are not employees will not preclude a finding that an employment relationship existed, an agreement that they *were* employees is of a different cloth. The protective cloak of the Act shields the employee; in doing so, it has no need to look past agreements that concede the statutorily protected status.

Finally, we are not persuaded that the students were actually "employees" because part or even a substantial part of the training at the school was of value only to an employee of American. If this factor were unduly emphasized, it would remove incentive for an employer to create schools and assimilate the untrained into the work force. Employers have little interest in creating a labor pool for their competitors. Otherwise stated, if the government's reading of the flow of benefits is accepted, there is no incentive to train by operating schools because the existence of incentives such as a pool of potential employees with skills meeting the employer's unique needs would transform the student into an employee.

---

4. Despite the Labor Department's own interpretation that the question is whether the employer derives "immediate advantage" from the activities of the students, the government persists in shifting the temporal focus to a post-training period.

In making this observation, this court makes no policy; it only implements the will of Congress as interpreted by earlier judicial decisions. The market place will create the incentives and disincentives and the resulting business arrangements. We here only give those business arrangements their place in the legal order. Operation of a school is by definition in the financial interest of American; if we equate the minimum benefits to American that perforce are the impetus for the school's existence as necessarily making the students employees, we have held that students are inevitably employees. We decline to strike the balance of benefits as urged by the government. In doing so, we believe we have more accurately expressed the will of Congress. Our task was no more and no less.

For these reasons, we conclude that neither students in American's flight attendant school nor students in its school for airline reservation sales agents, while attending the schools, were employees of American within the meaning of the Fair Labor Standards Act of 1938, as amended.[5]

**5.** We do not reach the question whether American violated the record-keeping provisions of the Act if the trainees are considered employees. The government abandoned its overtime provisions claim before trial.