Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,

v.

AMERICAN AIRLINES, INC., a corporation, Defendant-Appellee.

No. 81–1392.

United States Court of Appeals, Fifth Circuit.

Sept. 20, 1982.

---

T. Timothy Ryan, Jr., Sol. of Labor, Mary-Helen Mautner, Atty., U. S. Dept. of Labor, Washington, D. C., for plaintiff-appellant.

Glen Walker, American Airlines, Inc., Legal Dept., Bickel & Case, Thomas L. Case, Louis P. Bickel, Dallas, Tex., for defendant-appellee.

Before BROWN, RUBIN and REAVLEY, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The Secretary of Labor contends that individuals selected by American Airlines for training as flight attendants and reservation sales agents were employees of the airline, entitled to the benefit of the minimum wage and other provisions of the Fair Labor Standards Act while attending American's training center at the commencement of their relationship. The district court held that these trainees were not American's employees within the meaning of the statute. Finding its interpretation correct, we affirm.

### I.

American, whose headquarters are in Dallas, Texas, is a commercial air carrier engaged in interstate and overseas air transportation. To carry on its business, it employs, among others, flight attendants, who serve as crew members on American's flights, and reservation sales agents, who provide information, sell tickets, and make reservations over the telephone.

American employs about 650 new flight attendants and 800 new reservation sales agents each year. To fill these positions, it selects for training about 800 flight attendants, chosen from 70,000 applicants, and about 1,000 reservation sales agents, chosen from 30,000 applicants. American carefully screens applicants in order to evaluate their suitability for employment, reviewing their qualifications by means of a series of successive applications and group and individual interviews in order to select only the number needed to fill anticipated vacancies. In determining this number, American makes an allowance for those who will be found unsatisfactory, those who will drop out of the course voluntarily, and those who will, after completing the course, refuse employment.

Persons accepted for training are required to attend American's Learning Center in Dallas, Texas. American writes the persons selected, notifying them of their acceptance and advising them of the training class they are to attend. American also tells them that they will be required to report to their assigned base (probably New York or Chicago) immediately upon completing training and that, therefore, they should resign from other employment and leave automobiles behind. Trainees are notified about six weeks in advance of the scheduled session to allow them ample time to give notice to their employers and to complete their personal plans.

Trainees completing the course are not guaranteed a job, but, because they must give up other jobs, must receive training in Dallas, and are not paid during that time, both flight attendant and sales agent trainees generally seek to finish the course, thereby becoming eligible for jobs with American. Most assume correctly that American would not offer to spend signifi-

cant amounts training them if it did not hope to make them part of the airline's work force.

During training, trainees are offered meals and housing in dormitories provided by American, although some elect not to take advantage of these facilities. They are fitted for their appropriate wardrobe (for which those who become employees pay through payroll deductions) and are assigned their base city. American reserves the right not to hire any person who does not meet its standards.

American staggers the training sessions so that it is assured a supply of trained flight attendants and sales agents as needed. Its objective is to match the date the students will complete their training with the precise date the airline will require their services so that there will be neither shortage nor excess of trained flight attendants or of reservation sales agents. The procedures generally achieve American's goal.[1] Thus, during the period covered by this lawsuit, with few exceptions, successful completion of the training resulted in employment with American. American, however, is sometimes unable to offer immediate employment to graduates.[2] Thus, on one occasion an entire class was not hired because of an unexpected slump in the airline industry.

Each trainee acknowledges, in writing, that he or she is not an employee during training, and acceptance for training is not an offer of employment by American.[3] We turn now to the different courses required of the two groups of trainees.

## A. Flight Attendant Training

Flight attendant trainees receive training forty hours a week for four to five weeks. The training is conducted in classrooms and aircraft mock-up facilities. The instruction is designed to teach trainees to work for American, not for other airlines. The major part of the training is devoted to meeting the Federal Aviation Administration (FAA) requirements applicable to all flight attendants on the approximately 50 passenger airlines subject to FAA regulation. See 14 C.F.R. Part 121. Trainees must learn the emergency, safety, and convenience features of each aircraft American flies, as the FAA requires, but receive no information on other aircraft. They are taught American's emergency procedures and equipment, not those used by other airlines.

Similarly, the airline teaches them all of American's, and only American's, internal procedures, such as how to fill out cabin logs, American's policy regarding issuance of passes, and its procedures for handling pets. They are also taught American's practices in preparing and serving food and liquor, American's customer service practices, American's grooming requirements and, in general, American's "style."

During training, no trainee supplements the work of, or replaces, any American employee. Each trainee makes one observa-

---

1. American regularly forecasts how many flight attendants and reservation sales agents will be required to carry out the airline's projected flight operating plan. By using this information and keeping a close count of resignations, dismissals, leaves, vacations, and other data, the airline accurately predicts how many new employees it will need at a given time, overall and in each base city. American then notifies its Learning Center of the exact number of persons who should be trained as new flight attendants and reservation sales agents; this number incorporates a factor to account for those who will not complete training and those who will not accept employment for other reasons.

2. The government alleges that employee witnesses stated they felt they were "guaranteed" a job if they successfully completed training, and that they would not have taken the training otherwise. Actually, employee witnesses made it clear that they were confident of their ability to succeed in training, and assumed that American would not provide free training without hoping to offer jobs to those who became qualified. One witness testified she would have taken the training even if American were not interested in hiring her because the skills taught would assure employment elsewhere.

3. An employee cannot waive FLSA benefits so this agreement is material only insofar as it shows the expectations of trainees. See Barrentine v. Arkansas-Best Freight System, 450 U.S. 728, 739, 101 S.Ct. 1437, 1444–45, 67 L.Ed.2d 641, 653 (1981).

tion flight as a passenger and the one orientation flight (without contact with passengers) required by the FAA, but does not assist on any commercial flight.

About twenty percent of those who start flight attendant training do not complete it, but the record does not show what part of this group American rejects, formally or informally, and what part drops out. The record is also silent on the number who complete training but decline employment.

Over fifty other institutions, including preparatory schools and junior colleges, offer training similar to American's. At least one junior college offering flight attendant training periodically reviews American's program in determining its own curriculum. If American were to hire graduates of any of these programs, however, it would treat them like untrained persons and give them the entire American training program. There is no evidence that any individual who has completed American's training as a flight attendant has been immediately hired by any other airline.

## B. Reservation Sales Agent Training

Reservation agents are trained at the same Learning Center under similar conditions. Each trainee receives two or three 40-hour weeks of training conducted in special classrooms equipped with computer terminals and taught by a staff of professional instructors. The training is conducted in an academic environment and is virtually identical to the curriculum offered at vocational schools. Approximately 75 percent of the course covers operation of computer console equipment identical or similar to the consoles operated by most major airlines, travel agencies, and corporate travel departments. The balance of the training covers sales techniques, airport designations, computation of airline fares, and other subjects common to the travel industry. But trainees are taught only American's sales techniques and methods of computing fares, the features of American's air fleet, and operation of American's computer console equipment and software. American gives no instruction on the aircraft, sales techniques or procedures used by other airlines. Eighty-five to ninety percent of the reservation agents successfully complete training.

All employees, regardless of aptitude, previous education, or experience, must attend American's own training courses. Even those with experience working with computers and those with experience working in travel agencies must complete American's training course. Trainees have no contact with customers and, other than to receive training, they perform no duties that in any way serve American. They displace no American employees. American gives similar training of a more advanced nature to approximately 8,000 travel agency employees each year on a contract basis.

Almost all reservation agent trainees are offered employment by American; if they accept it, they are placed on American's payroll and receive additional on-the-job training, for which they are paid. Trainees are not obligated to accept employment with American at the conclusion of their training, and some drop out or seek other employment.

## C. The District Court's Decision [4]

The district court found that, unlike the education in a school or college, flight attendant training is "tailored to the needs of American." *Donovan v. American Airlines, Inc.*, 514 F.Supp. 526, 529 (N.D.Tex.1981). But it also found that a "substantial percentage of [the] skills acquired through the [training] school ... is fully fungible," *id.*, in that those skills can be utilized by other airlines with minimal additional training. Nevertheless, owing to the "unwillingness of the airlines to offer training tailored to

---

4. The standard of review of the district court's decision is that of a legal, and not a factual, determination. Thus, although we are bound by the clearly erroneous standard in reviewing the individual findings of fact leading to the district court's conclusions, we review the determination that the students here were not employees as we review any determination of law. *See Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185, 1189 n.11 (5th Cir. 1979). *Cf. Pullman-Standard v. Swint,* —— U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).

transferees," these skills cannot in fact be transferred. *Id.* "[I]ndustry practice," the court stated, "is to require all applicants to be trained in each airline's own school." *Id.*

The court resolved the ultimate legal question by analyzing the "relative benefits flowing to trainee and company during the training period." *Id.* at 533. The facts that regular employees are not displaced by the trainees and that the training is expensive, without "immediate" benefit to American, "turn the benefit flow in the direction of the employee." *Id.* at 534. The court recognized the benefits accruing to American; the operation of the school is "by definition in the financial interest of American," *id.* at 535, for companies generally have "little interest in creating a labor pool for their competitors." *Id.* at 534. Nevertheless, the court regarded the product of training as merely a labor pool of potential employees, offering American an insufficient benefit to bring the Act into play.

## II.

The Fair Labor Standards Act defines "employee" simply as "any individual employed by an employer," and "employ" as including "to suffer or permit to work." 29 U.S.C. §§ 203(e)(1), 203(g). Thus, the term "employee" is used in the broadest sense "ever . . . included in any one act." *E.g., Shultz v. Hinojosa*, 432 F.2d 259, 264 (5th Cir. 1970) (quoting *United States v. Rosenwasser*, 323 U.S. 360, 363, 65 S.Ct. 295, 296, 89 L.Ed. 301 (1945); *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 143 (6th Cir. 1977)).

The Supreme Court addressed the question whether a person being trained to fill a position is an employee under the Act thirty-five years ago in two companion cases, *Walling v. Portland Terminal Co.*, 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947) and *Walling v. Nashville, Chattanooga & St. L. Ry.*, 330 U.S. 158, 67 S.Ct. 644, 91 L.Ed. 816 (1947). Portland Terminal, a railroad, had for many years given prospective brakemen a preliminary training course averaging seven or eight days. No applicant who sought work as a brakeman could be accepted without completing this training. Trainees did not attend classrooms but, under the supervision of a yard crew, learned the work routine by observing the actual work. Each was then gradually permitted to do actual work under close scrutiny. Those who completed the course satisfactorily were included on a list from which the company drew brakemen when needed. Those who were certified and not immediately put to work formed a pool of qualified workers available to the railroad as openings occurred.

The Court held that these trainees were not employees. While some trainees may be employees, and trainees promised compensation must be paid the full benefits required by the Act, this does not mean that all trainees are covered. Those who "work for their own advantage on the premises of another" are not "suffered or permitted to work," 330 U.S. at 152, 67 S.Ct. at 641, 91 L.Ed. at 812. Those who attend a school to train them for employment in an industry may become a labor pool but, until they are hired, they are not employees, for the Act "was not intended to penalize railroads for providing, free of charge, the same kind of instruction at a place and in a manner which would most greatly benefit the trainees." 330 U.S. at 153, 67 S.Ct. at 641, 91 L.Ed. at 813. Finally, unless the railroads receive an " 'immediate advantage' *from any work done* by the trainees," the trainees are not employees. 330 U.S. at 153, 67 S.Ct. at 642, 91 L.Ed. at 813 (emphasis added).

Some courts have attempted to develop a set of tests from the simple and direct language of Justice Black's opinion in *Portland Terminal.* Thus, one court has formulated three criteria: (1) whether the trainee displaces regular employees; (2) whether the trainee *works* solely for his or her own benefit;[5] and (3) whether the company de-

---

**5.** There is no consensus on this element of the test. *See, e.g., Bailey v. Pilots Ass'n for the Bay & River Delaware*, 406 F.Supp. 1302 (E.D. Pa.1976) ("primary benefit" to the employer); Wage & Hour Administrator's Criteria, *infra*

rives any *immediate* benefit from the trainee's work. *See Wirtz v. Wardlaw*, 339 F.2d 785 (4th Cir. 1964). The first and third of these are based on the precise phrasing of *Portland Terminal.* The second part of this formulation in part begs the question: presumably if trainees "work," they are employees. Moreover, if attendance were *solely* for the trainee's benefit, the company would not conduct the school except as a matter of altruism or public pro bono. In this respect, the district court's balancing analysis appears to us to be more appropriate.

American's trainees do not displace any regular American employees. Although training benefits American by providing it with suitable personnel, the trainees attend school for their own benefit, to qualify for employment they could not otherwise obtain. The district court's finding that trainees gain the greater benefit from their experience is fully supported by the evidence. Finally, the district court found that American did not receive immediate benefit from the trainees' activities at the Learning Center. It observed that trainees are not productive for American until after their training ends.[6]

Indeed, if we return to the *Portland Terminal* opinion and change the word "railroad" to the word "airline," the decision fits this case. The *Portland Terminal* court did not rest its conclusion on whether training persons to do its work was economically beneficial to the railroad. In fact it is clear that the railroad, like American in the present case, considered the training program helpful to it, not merely a service to those who wanted to learn to be brakemen. Had this not been so, the railroad would not have used paid employees to teach instead of to do other work. American likewise would be ill-advised to train flight attendants and sales agents to work for other airlines. It patently did not operate its Learning Center as an eleemosynary act.

American's schooling is but one step, albeit integral, in preparing novices for their jobs. Trainees make a sacrifice to attend school. But so do all who seek to learn a trade or profession. Centralized training is to American's advantage, but the airline has no duty to offer training at an inconvenient place. The training process is made more effective and less expensive by requiring full time attendance under American's control and devoting it entirely to American's policies. These factors do not, however, mean that trainees are working while receiving this instruction.

In none of these respects was American's practice appreciably different from Portland Terminal's. Unlike the Secretary, we do not understand that Portland Terminal intended to create a labor pool. It intended to train brakemen. Those trained went into a pool only if, when they completed training, the railroad could not offer them employment.

We are aware that many companies hire persons as employees and then pay them while they attend company schools. These employers are governed, as the district court observed, by the demands of the market place and by their own specialized needs. The FLSA does not require American to follow this course.

We conclude, therefore, that the district court's conclusion is correct. This conclusion is consistent with the result reached by other circuits. *See Ballou v. General Electric Co.*, 433 F.2d 109 (1st Cir. 1970), *cert. denied*, 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971); *Marshall v. Baptist Hospital, Inc.*, 473 F.Supp. 465 (M.D.Tenn. 1979), *rev'd on other grounds*, 668 F.2d 234 (6th Cir. 1981); *Bailey v. Pilots' Association*

---

note 7 (training is "for the benefit of the trainees").

**6.** The government argues that "immediate" benefit should not be equated with "simultaneous" benefit. American does, of course, benefit in some sense both during and after the training because it is generally able to replace outgoing employees without any gap or overlap. *See supra* note 1. If there is significance in the distinction the government seeks to draw between benefit that is immediate although not simultaneous, we do not perceive its importance here, for the benefit to American had neither characteristic.

*for the Bay & River Delaware*, 406 F.Supp. 1302 (E.D.Pa.1976). In *Bailey*, the FLSA was found applicable but the analysis reinforces our conclusion, for the trainee there involved substituted for hired personnel, was included as a member of the full crew complement on the ship to which he was assigned, and, during training, performed tasks necessary to the ship's functioning.

Furthermore, the Wage and Hour Administrator's interpretation of *Portland Terminal* supports the district court's conclusion. The Administrator has formulated a six-item list designed to answer the question whether trainees are employees within the meaning of the FLSA.[7] The trainees here are not employees by each of those criteria: the training is similar to that given at vocational schools; the training is for the benefit of the trainees; the trainees do not displace regular employees and work under close observation; the employer derives no immediate benefit from the training; the trainees are not necessarily entitled to a job at the conclusion of the training, and the employer and the trainee understand that no wages will be paid for the training. *See* Wage & Hour Manual (BNA) 91:416 (1975); *accord* Opinion of the Wage & Hour Administrator WH–229 (June 19, 1973) (if all six of the criteria are met, no employment relationship exists), *reprinted in* Wage & Hour Manual (BNA) 91:451 (1975).

For these reasons, we AFFIRM the judgment of the district court.

---

7. The criteria are:
   (1) the training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school;
   (2) the training is for the benefit of the trainees;
   (3) the trainees do not displace regular employees, but work under close observation;
   (4) the employer that provides the training derives no immediate advantage from the activities of the trainees and on occasion his operations may actually be impeded;
   (5) the trainees are not necessarily entitled to a job at the completion of the training period; and,
   (6) the employer and the trainees understand that the trainees are not entitled to wages for the time spent in training.

Wage & Hour Manual (BNA) 91:416 (1975).